RECORD NO. 21-1201

*In The*

# United States Court of Appeals
### For The Fourth Circuit

## CLARA SCHACK,

*Plaintiff – Appellant,*

**v.**

## PARALLON ENTERPRISES, LLC,

*Defendant – Appellee,*

**and**

## LEWIS-GALE HOSPITAL, INCORPORATED;
## HCA - THE HEALTHCARE COMPANY;
## MONTGOMERY REGIONAL HOSPITAL, INC.,

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ROANOKE**

───────────────

**BRIEF OF APPELLANT**

───────────────

**Brittany M. Haddox**
**Thomas E. Strelka**
**STRELKA EMPLOYMENT LAW**
**119 Norfolk Avenue, SW, Suite 330**
**Roanoke, Virginia 24011**
**(540) 283-0802**

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-1201__          Caption: __Clara Schack v. Parallon Enterprises, LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Clara Schack__
(name of party/amicus)


_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.      Does party/amicus have any parent corporations?                              ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:


3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐YES ☑NO
        If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?          ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _Brittany M. Hadbox_          Date: ____03/03/2021____

Counsel for: Appellant Ciara Schack

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iii

I. JURISDICTIONAL STATEMENT ............................................... 1

II. STATEMENT OF THE ISSUES ................................................... 2

III. STATEMENT OF THE CASE ...................................................... 2

IV. STANDARD OF REVIEW .......................................................... 20

V. SUMMARY OF ARGUMENT .................................................... 20

VI. ARGUMENT ............................................................................... 23

    1. <u>Breach of Contract and Fraud in the Inducement</u>: Regional Director Gillespie offered to laterally transfer Ms. Schack to another position if she submitted her resignation for her current position; Ms. Schack accepted and submitted her resignation for her current position; Ms. Gillespie did not laterally transfer Ms. Schack to the other position ............................................................ 23

    2. <u>ADA and PDA Pregnancy-Related Disability Constructive Discharge</u>: Ms. Schack did not miss too much work such that she was not a "qualified" individual. She was not even terminated, let alone terminated for missing work ................................................ 26

        a. <u>Adverse Act</u>: Ms. Schack's involuntary resignation based on Regional Director's misrepresentation and/or deception constitutes constructive discharge ............................ 26

        b. <u>Disabled or Regarded as Disabled</u>: Regional Director Gillespie admitted that she regarded Ms. Schack as disabled, and Ms. Schack is protected by the plain language of the PDA ................................................. 27

i

c.    "Qualified": Parallon conceded at oral argument that "Parallon believed [Ms. Schack] could perform her duties." ....................................................................28

3.    ADA and PDA Failure to Accommodate: Whether Ms. Schack was "qualified" at the time she was tricked into resigning is not relevant to whether she should have been accommodated prior to that time when her physician suggested the accommodation of shorter shifts.  Moreover, there is not sufficient evidence for the district court to have assumed that Ms. Schack could not have performed the HIM Clerk position, especially when Parallon admitted Ms. Schack was qualified for the position ..........................34

a.    Disability: Regional Director Gillespie admitted that, based on the form provided by Ms. Schack's physician, Ms. Schack was entitled to ADA protection.............................34

b.    Notice: Ms. Schack notified HR that she had "a medical condition which was impacting [her] pregnancy" and requested a reasonable accommodation, and Regional Director Gillespie admitted she knew the formal diagnosis of Ms. Schack's disability was Hyperemesis Gravidarum .......35

c.    Performing Essential Functions of an Open Position and Denial of Reasonable Accommodation: Ms. Schack could have performed her position with the reasonable accommodation of shorter shifts and/or could have performed the position of HIM Clerk.  Ms. Schack's request for shorter shifts was denied, and it is undisputed that she was never placed in the HIM Clerk position ...............35

VII.    CONCLUSION...............................................................39

VIII.    REQUEST FOR ORAL ARGUMENT .......................................40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abi-Najm v. Concord Condo., LLC*,
    280 Va. 350, 699 S.E.2d 483 (2010) ............................................................24

*Baker v. Baker*,
    2019 U.S. App. LEXIS 36648 (4th Cir. Dec. 11, 2019) ...............................20

*Bragdon v. Abbott*,
    524 U.S. 624 (1998)......................................................................................34

*Clarke v. Collins*,
    73 Va. Cir. 12 (Lynchburg City 2006) ........................................................25

*Edwards v. Montgomery Coll.*,
    2018 U.S. Dist. LEXIS 173325 (D. Md. Oct. 9, 2018) ................................38

*Filak v. George*,
    267 Va. 612, 594 S.E.2d 610 (2004) ...........................................................23

*Flowers v. Wal-Mart Stores*,
    927 F. Supp. 952 (E.D. Va. 1996) ...............................................................24

*J.D. v. Colonial Williamsburg Found.*,
    925 F.3d 663 (4th Cir. 2019) .......................................................................30

*Jones v. Fulton Bank, N.A.*,
    565 F. App'x 251 (4th Cir. 2014)................................................................23

*King v. Blanchard Mach. Co.*,
    2012 U.S. Dist. LEXIS 141201 (D.S.C. Sep. 28, 2012) ........................26, 27

*Lacasse v. Didlake, Inc.*,
    712 F. App'x 231 (4th Cir. 2018)................................................................26

*Miller v. Md. Dep't of Nat. Res.*,
  813 F. App'x 869 (4th Cir. 2020)....................................................30

*Myers v. Hog Slat, Inc.*,
  2014 U.S. Dist. LEXIS 152649 (N.D. Iowa Oct. 24, 2014).........................40

*Pettus v. Am. Safety Razor Co.*,
  2001 U.S. Dist. LEXIS 6968 (W.D. Va. Mar. 29, 2001) ............................33

*Reeves v. Sanders Plumbing Products, Inc.*,
  530 U.S. 133 (2000)...................................................................20

*Reid v. Boyle*,
  259 Va. 356, 527 S.E.2d 137 (2000) ...........................................25

*Rhoads v. Fed. Deposit Ins. Corp.*,
  257 F.3d 373 (4th Cir. 2001) .......................................................34

*Sea-Land Serv., Inc. v. O'Neal*,
  224 Va. 343, 297 S.E.2d 647 (1982) ...................................2, 24, 25

*Shepherd v. Geo. W. Park Seed Co.*,
  2008 U.S. Dist. LEXIS 76636 (D.S.C. Aug. 26, 2008)...............................28

*Stone v. University of Maryland Medical System Corp.*,
  855 F.2d 167 (4th Cir. 1988) .......................................................26

*Summers v. Altarum Inst., Corp.*,
  740 F.3d 325 (4th Cir. 2014) .......................................................30

*Sylvia Dev. Corp. v. Calvert Cty.*,
  48 F.3d 810 (4th Cir. 1995) .......................................................20

*Tolan v. Cotton*,
  134 S. Ct. 1861 (2014)...............................................................20

*Torres v. Hilton Int'l of P.R., Inc.*,
  2012 U.S. Dist. LEXIS 91436 (D.P.R. July 2, 2012)...................................33

*Tyndall v. National Educ. Ctrs.*,
    31 F.3d 209 (4th Cir. 1994) ...............................................................31, 32, 33

*West v. J.O. Stevenson, Inc.*,
    164 F. Supp. 3d 751 (E.D.N.C. 2016) ..........................................................28

*XL Specialty Ins. Co. v. Truland*,
    2015 U.S. Dist. LEXIS 25599 (E.D. Va. Mar. 3, 2015)................................23

**STATUTES**

28 U.S.C. § 1291 ....................................................................................................1

42 U.S.C. § 12102(3)(A)......................................................................................28

42 U.S.C. § 2000e(k) ...........................................................................................28

**RULE**

Fed. R. App. P. 4(a)(1)(A) ....................................................................................2

**REGULATION**

29 C.F.R. § 1630.2(l) & (app.)............................................................................28

**OTHER AUTHORITIES**

Pub. L. No. 110-325, § 2(b)(1), 122 Stat. 3553 .................................................30

Title VII of the Civil Rights Act of 1964.............................................................28

## I.    JURISDICTIONAL STATEMENT

Appellant Clara Schack filed suit in the United States District Court, Western District of Virginia, Roanoke Division on November 15, 2019 (JA 2), bringing claims for pregnancy discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, disability discrimination and failure to accommodate pursuant to the Americans with Disabilities Act, and breach of contract and fraud in the inducement, as Ms. Schack was induced to resign her current position to be moved to a different position that was presented as being easier on Ms. Schack until she recovered from Hyperemesis Gravidarum, a rare condition that can develop during pregnancy causing relentless vomiting; the Director accepted her resignation but did not transfer Ms. Schack to the new position, thus ending her employment with Parallon — as discovery has shown, the Director had been incessantly complaining about Ms. Schack's absences due to her pregnancy-caused disability and asking that Ms. Schack be terminated, a fact of which Ms. Schack was unaware when she agreed with the Director to submit her resignation for her current position to be transferred to the new position. (*Id.*).

The district court granted Appellee's Motion for Summary Judgment and dismissed each of Appellant's claims on February 8, 2021 (JA 762).

Appellant timely filed a Notice of Appeal on February 22, 2021 (JA 763). This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which provides that "[t]he

Court of Appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States." *See also* Fed. R. App. P. 4(a)(1)(A).

## II.    STATEMENT OF THE ISSUES

1.    The district court erred in finding that no questions of fact existed as to the existence of a contract and fraud in the inducement as *Sea-Land Land Serv., Inc. v. O'Neal*, 224 Va. 343, 297 S.E.2d 647 (1982)  is indistinguishable from this case.

2.    The district court erred when it dismissed each of Ms. Schack's ADA and PDA claims, finding, erroneously, that, as a matter of law, Ms. Schack was not "qualified" for her position that she was *not* terminated from.

## III.    STATEMENT OF THE CASE

Ms. Schack began employment with Parallon on July 23, 2018 (JA 142), as a Registrar at LewisGale Hospital Montgomery facility in Blacksburg, Virginia (JA 134).  Ms. Schack's chain of command was: (1) Lisa Albert, Patient Access Manager, (2) Suzanne Caldwell – Patient Access Director, and (3) Jenn Gillespie – Patient Access Regional Director (JA 132).  Regional Director Gillespie reports directly to Parallon's CEO (JA 321).

Approximately one month into Ms. Schack's employment, in August 2018, Ms. Schack learned that she was pregnant and notified Manager Albert and Director Caldwell (JA 148-149).

Ms. Schack developed an ovarian cyst in early September 2018 (JA 485) and soon thereafter became very ill, ultimately being diagnosed with Hyperemesis Gravidarum (JA 224; JA 488). Ms. Schack notified management of her serious symptoms:

Sun, Sep 2, 10:36 AM

Hey Lisa I have been extremely sick and exhausted today so if it's okay with you Angela is going to take my shift tonight 5p-1:30a

Sun, Sep 9, 8:45 AM

Hi Lisa, I really hate to do this as I have never had to call out for shifts like I have with this pregnancy. I am in a lot of pain and having a lot of vomiting. I go see my doctor tomorrow and I am hoping he can give me something for all of this

(JA 510; JA 511; *see also* JA 337-338, 346 (Regional Director Gillespie aware of serious symptoms); JA 350 (Regional Director Gillespie aware that the formal diagnosis for such a condition is Hyperemesis Gravidarum); JA 451, 455-458 (Supervisor Caldwell aware of serious symptoms)). Ms. Schack was so ill that she lost 13 pounds in two months, between September-October 2018, while a child was growing inside her adding weight (JA 523; JA 487; JA 489; JA 491; JA 521).

Ms. Schack reached out to Harriet Spencer-Bennett, HR (JA 531), on or about September 13, 2018, and stated that she "had a medical condition which was impacting [her] pregnancy" and requested a reasonable accommodation (JA 159-160). Ms. Schack requested that her OBGYN provide documentation concerning her medical condition and need for accommodation to Parallon; the physician took two

3

weeks to provide the documentation (JA 160-161; JA 163: "I ha[d] left messages to the nurse that I needed those documents as soon as possible.")).[1]

During those two weeks, Ms. Schack worked as much as she could, kept Parallon up to date on her medical condition, and provided notice when she was medically unable to work:



(JA 503).                     (JA 504).                     (JA 507).

(JA 512).

---

[1] Had Parallon wanted documentation more quickly, Parallon could have contacted her physician because Ms. Schack signed a release permitting Parallon to speak directly with her physician (JA 259-260). Moreover, Ms. Schack's OB/GYN is an HCA physician (*E.g.*, JA 491-492); Parallon is a subsidiary of HCA (JA 650). Thus, their own doctor was causing the delay.

Then, nine days after Ms. Schack notified management that she was in the ER, and four days after Ms. Schack notified management that she was having to obtain fluids again due to the dehydration caused by her excessive vomiting (JA 513), Regional Director Gillespie made it known she was angry:

From:        Gillespie Jenny
Sent:        Thursday, September 27, 2018 10:34 AM
To:          Caldwell Suzanne
Subject:     RE: Clara Schack

UGHHHHHHHHHHHHH.

Thanks,

Jenn Gillespie

-----Original Message-----
From: Caldwell Suzanne
Sent: Thursday, September 27, 2018 10:02 AM
To: Gillespie Jenny <Jennifer.Gillespie@Parallon.com>
Subject: Clara Schack

FYI- just keeping you updated. Clara called out for her shift today.

Thanks,
Suzanne

(JA 271).

Ms. Schack, unable to control the excessive vomiting and dehydration, continued to keep management in the loop:



Mon, Oct 1, 6:36 AM

Due to being sick all night and this morning I won't be able to make it in today. My doctor should have sent in some paperwork to HR for some time off to get this under control

Tue, Oct 2, 6:51 AM

Lisa I have been trying to get ready for work but I'm extremely dizzy, nauseous and I feel weak. I'm hoping to make it in tomorrow without any issues.

Wed, Oct 3, 7:12 AM

I won't be making it in today and will be going to my doctor. I'm not sure what's going on but Its not been good this week

(JA 514).

Despite Ms. Schack keeping management up to date and doing all she could to get her physician to provide the requested note, on October 1, 2018, only ***two weeks***

5

after beginning the accommodation process, Regional Director Gillespie indicated she

was "not okay delaying any longer" (JA 273), asked HR Manager Spencer-Bennett for

"guidance as to next steps" (JA 273), and when HR Manager Spencer-Bennett was not

immediately available, insisted that another HR personnel contact her immediately as

"we need to resolve ASAP with this particular case" (JA 272):

> **From:** Gillespie Jenny
> **Sent:** Monday, October 01, 2018 10:23 AM
> **To:** Spencer-Bennett Harriett <Harriett.SpencerBennett@Parallon.com>; Caldwell Suzanne <Suzanne.Caldwell@Parallon.com>
> **Cc:** Norman Karol <Karol.Norman@Parallon.com>; Bathen Heather <Heather.Bathen@Parallon.com>
> **Subject:** FW: Clara Schack
>
> Harriett,
>
> See below for the latest, and please keep in mind the below does not include shortened shifts, only call outs. We need to move forward today; I'm not okay delaying any longer as she was already given extra time to provide paperwork.
>
> Can you provide guidance as to next steps?
>
> **Jenn Gillespie**

(JA 273).

Thereafter, on or about October 3, 2018, only two weeks after initially

requesting an accommodation, Ms. Schack's physician returned a note to Parallon,

dated September 28, 2018, requesting the accommodation of excusing Ms. Schack

from work for fourteen days:

**NATURE OF THE QUALIFYING DISABILITY:**

Extreme Nausea and vomiting due to pregnancy

**REQUESTED/SUGGESTED ACCOMMODATION:** (Please describe the accommodations you believe are needed to that will enable the employee to perform the essential functions of this job.)

Please excuse patient from work for 14 days due to condition.

Provider's name and business address: George Zelovick, MD

Type of practice / Medical specialty: OB/GYN

Telephone: 540) 443-0500      Fax: 540) 553-0526

Signature of Health Care Provider:          Date: 9/28/18

(JA 275).

Ms. Schack was not immediately notified that her accommodation request was granted; thus, she continued to keep management aware when she was unable to work:

Thu, Oct 4, 9:20 AM

I just wanted to give you a heads up I have not been able to stop vomiting and hold anything down so I won't be able to make it in. I tried texting Alex to cover my shift but did not get a response back

(JA 515).

Ultimately, on October 5, 2018, Ms. Schack was notified she was being given two weeks off, which was backdated to begin on October 1, 2018 (JA 294).

Four days *after* Ms. Schack was notified her leave had been approved, going around HR Manager Spencer-Bennett, Regional Director Gillespie accused

7

Ms. Schack of filling out the accommodation form herself, which was false, and

Regional Director Gillespie specifically acknowledged that Ms. Schack was entitled to

ADA protections based on the form:

| | |
|---|---|
| **From:** | Gillespie Jenny |
| **Sent:** | Tuesday, October 9, 2018 4:47 PM |
| **To:** | Bathen Heather;Norman Karol |
| **Subject:** | FW: Clara Schack |
| **Attachments:** | DOC004.pdf; Schack, Clara_100218.xlsx |

Karol,

Here is the form that Clara returned. I am concerned that she filled it out and particularly the section regarding her condition which offers her ADA protection. I've also attached her attendance/occurrence record; she had 9 call outs prior to the request for reasonable accommodation. We can't address those?

Thanks,

**Jenn Gillespie**

(JA 292).

Continuing, during the two-week period that Ms. Schack was off work, and two

days after Regional Director Gillespie accused Ms. Schack of fabricating the note from

her physician, Ms. Schack became so ill that she had to have a Central PICC IV Line

inserted in her arm on October 11, 2018 (JA 169; JA 518; *see also* JA 338, 346, 386,

455 (management aware of IV Line)).  Ms. Schack was thereafter required to have

home health come to her home to administer fluids (JA 276; JA 258).

On October 15, 2018, four days after having a permanent IV line placed in her

arm (JA 518), Ms. Schack let Parallon know that she would need accommodation upon

her return to work the following day — specifically, Ms. Schack requested the

accommodation of shorter shifts:

Mon, Oct 15, 11:25 AM

> Hi Suzanne I wanted to reach out to you and talk about the scheduling. I was wondering if there is anyway we can reduce my shift hours to around 5-6 hours. I have had a PICC line inserted to get fluids everyday from home. The fluids are helping but after a period of time I start feeling bad again. Could we try reduced hours for now as my hopes are my second trimester will go much better? I appreciate all you al have done for me. Thank you, Clara

(JA 509; *see also* JA 277). Dr. Zolovick, Ms. Schack's OBGYN, is the individual who

recommended the accommodation (JA 260; JA 297, HR Manager Spencer-Bennett

email, "Her physician recommended that she is able to work at least a 5-6 hour shift.").

Even though this request was among the suggested reasonable accommodations

listed in Parallon's ADA policy (JA 299; JA 569-570), Regional Director Gillespie

was adamant that the accommodation request would not be granted:



From: Gillespie Jenny
Sent: Monday, October 15, 2018 11:33 AM
To: Spencer-Bennett Harriett
Cc: Caldwell Suzanne
Subject: Clara Schack

Importance: High

Good Morning, Harriett,

Clara Schack reached out to Suzanne this am to ask for additional accommodation (not to be scheduled more than 5-6 hours per shift); we sent her in your direction. We cannot support any additional accommodations at this point and Clara will be scheduled as needed.

Please advise if you need to talk – Thanks.

**Jenn Gillespie**
**Regional Director, Patient Access**
**Parallon Business Performance Group**
C: 540.315.0317
P: 540.776.4745
Jennifer.Gillespie@parallon.com
www.parallon.com

PARALLON·

(JA 269).

Notably, Regional Director Gillespie clearly testified falsely about this matter:

Q.    Did you ever tell Ms. Bennett that no more accommodation requests by Ms. Shack could be accommodated?
A.    That wouldn't be my call, but I do very specifically remember with the shortened shifts telling her that we would do our best to accommodate…

(JA 399).

And, thereafter, Ms. Schack's shift length *increased*, not decreased. The month prior to Ms. Schack's request for reduced hours, Ms. Schack was scheduled as follows:

1.  9/16: 5 hours
2.  9/18: 8 ½ hours
3.  9/20: 8 ½ hours
4.  9/24: 8 ½ hours
5.  9/25: 4 hours
6.  9/27: 4 hours
7.  10/1: 8 ½ hours
8.  10/2: 8 ½ hours
9.  10/3: 8 ½ hours
10. 10/4: 4 hours
11. 10/7: 5 hours
12. 10/11: 4 hours

(JA 278). Thus, the average length of Ms. Schack's shift was 6.42 hours. Ms. Schack was scheduled for numerous four- and five-hour shifts. The latest Ms. Schack was scheduled to work was 7:30 p.m. (*Id.*).

The month after Ms. Schack's accommodation request for reduced shift length, Ms. Schack was scheduled as follows:

10

1. 10/16: 6 hours
2. 10/18: 6 hours
3. 10/20: 10 ½ hours
4. 10/21: 6 hours
5. 10/25: 6 hours
6. 10/26: 8 ½ hours
7. 10/29: 8 ½ hours
8. 10/30: 6 hours
9. 11/1: 6 hours
10. 11/3: 7 1/2 hours
11. 11/6: 7 hours
12. 11/8: 7 hours

(JA 279).  Thus, the average length of Ms. Schack's scheduled shift *increased* to 7.08 hours.  Ms. Schack was always scheduled for shifts in excess of five hours and was scheduled to work as late as 12:30 a.m. (*Id.*).

Despite being given longer and later shifts, while having a permanent PICC line in her arm, Ms. Schack valiantly attempted to work through her disability for the next several weeks, including vomiting in bathrooms at work and on lunch breaks (JA 493, 494).

Yet, Regional Director Gillespie became more and more angry.

On October 26, 2018, within 11 days of Ms. Schack returning, Regional Director Gillespie was ready to move to a final written warning:

11

**From:** Gillespie Jenny
**Sent:** Friday, October 26, 2018 9:50 AM
**To:** Norman Karol <Karol.Norman@Parallon.com>; Spencer-Bennett Harriett <Harriett.SpencerBennett@Parallon.com>
**Cc:** Caldwell Suzanne <Suzanne.Caldwell@Parallon.com>
**Subject:** FW: Clara Schack
**Importance:** High

Good Morning,

Yesterday, Clara called out which brings her occurrences (excluding all pregnancy/ADA covered leaves) to two (2). Today, Clara no called/no showed; Suzi and Lisa were made aware by Alexandria Wright who arrived to work Clara's scheduled shift. She is now on her 94th day of employment, however, as we discussed previously, I feel strongly her probation should be extended to cover the length of her ADA call outs. In that regard, she's still in her extended probationary period. Your thoughts? I'd like to move to a final written.

Thanks,

**Jenn Gillespie**

(JA 288).

Then, on November 6, 2018, Director Caldwell sent a false email to Regional

Director Gillespie indicating that Ms. Schack had no called/no showed and stating

that she was "hoping we can terminate soon":

| | |
|---|---|
| **From:** | Caldwell Suzanne |
| **Sent:** | Tuesday, November 6, 2018 12:47 PM |
| **To:** | Gillespie Jenny |
| **Subject:** | Updated corrective action document - Clara Schack |
| **Attachments:** | Corrective Action_Schack, Clara_110118.docx |
| **Importance:** | High |

This has been updated to include Clara's most recent absences as well as today's no call/no show. She was scheduled today from 1130-630, and she is not here. I have checked my phones as well as Lisa's and we have no messages or missed calls. This is now her second no call/no show. Her first no call/no show was on 10/26.

Lisa sent a text yesterday to remind her of her shift since she has not worked in a week – she confirmed that she had her printed schedule. I can resend to you and HR, but since this is such a recurring topic I thought I would send to you first. I am hoping we can terminate soon. If not, I plan to remove her from next month's schedule until further notice in an attempt to salvage the morale of my team.

Thanks as always,

**Suzanne Caldwell**

12

(JA 291).  Contrary to Director Caldwell's statement, Ms. Schack contacted Director

Caldwell 2 ½ hours before the start of her shift:

> Tue, Nov 6, 9:00 AM
>
> Hi Suzanne I tried calling the hospital but had to hang up. I have been non stop vomiting this morning since 5:30am and did a bag of fluids but I am going to have to do another. I'm very sick this morning and I'm not sure why so I'm waiting to hear back from my doctor about being seen today. I didn't want to come into work vomiting constantly

(JA 493; *see also* JA 190, "I texted them about all of my … absences.").

The next day, November 7, 2018, Ms. Schack was assessed a Corrective

Action based on the false assertion that she had failed to notify management that she

was unable to work (JA 281-282).

Understandably upset by the false write-up, on November 7, 2018,

Ms. Schack reached out to HR Manager Spencer-Bennett, who sent her to Regional

Director Gillespie (JA 295).   Ms. Schack, not knowing that Regional Director

Gillespie had been in the loop on her situation up to that point (JA 184), relayed to

Regional Director Gillespie everything that had occurred:

> I explained to her what has been going on. I explained my absences,
> why I was absent, my health condition I was diagnosed with during this
> to cause myself to miss so much work.  I explained everything going
> on as well as this Corrective Action, that I disagreed with the Corrective
> Action because I have proof of -- of the things that I disagreed with,
> and I explained to her I needed shorter work hours because I never knew
> when I was going to be sick, and she told me that she was sorry about
> all of this, that a text message was appropriate due to my illness, and

the way that the illness impacted my everyday life as well as speaking
on the phone, that she would get with Lisa and Suzanne and she would
excuse my absences as well as create a plan, and she actually told me –
she asked me if I needed some more time off, and she told me that she
would let Lisa and Suzanne know I would not be there for my next shift.

(JA 182-183).  Regional Director Gillespie assured Ms. Schack that she need not do

anything further with respect to her accommodation requests or missed days (JA

190, Regional Director Gillespie "just said that it would all be taken care of per her"),

that Regional Director Gillespie would be the one handling it from there (JA 185).

And, thereafter, Ms. Schack sent Regional Director Gillespie the text messages that

proved that the statements in the Corrective Action were false (JA 185-186; JA 495-

497).

Ms. Schack also informed her father about the Corrective Action (JA 186-

187).  Therefore, Ms. Schack's father also spoke with Regional Director Gillespie

on November 9, 2018 (JA 582-583).  Mr. Schack called Regional Director Gillespie

because Ms. Schack was "majorly impacted by [her] diagnosis, and he was worried

and he just wanted to figure out what was going on and then talk to [her] about it. …

He was just concerned because of [Ms. Schack's] health, and he also wanted to

mention to her the daily impact that it did have on [Ms. Schack's] life, to say, you

know, this isn't Clara, this isn't how she normally is, and really just describe the

medical illness that [Ms. Schack] was diagnosed with" (JA 187-188).[2]  During this call, Regional Director Gillespie recommended to Mr. Schack that Ms. Schack be transferred to the HIM Clerk position, which Regional Director Gillespie believed would be an easier job on Ms. Schack while suffering from a pregnancy-related disability (JA 582; *see also* JA 421 (the hours were daytime, instead of 24/7); JA 189 (the job would be "[l]ess stress on [her] body. [She] wouldn't be running around the E.R. …[She] would be seated in an office that was less demanding").  Ms. Schack discussed this position with Regional Director Gillespie (JA 191), as well, and Ms. Gillespie offered to laterally move Ms. Schack to the position, which Ms. Schack accepted and detrimentally relied upon:

> Q.     During this conversation, you said that you and she also talked about another position that might be better suited for you, right?
> A.     Yes.
> Q.     And that was a medical records position in a totally different department?
> A.     Yes.
> Q.     And did you say that you had found that; you were looking and you actually had found that position and that one might be interesting to you?
> A.     No, she recommended that to my dad, and then she spoke with me about it per a phone call that we had.

---

[2] Regional Director Gillespie falsely claims Mr. Schack was hostile and has misrepresented what was stated during this call (JA 582-583). Regional Director Gillespie also claims she called HR "after I hung up with Mr. Schack" (JA 355). Instead, after this alleged over-the-top threatening call, which lasted from 10:51AM until 10:59AM, Regional Director Gillespie made no more calls until over an hour (an hour and 13 minutes to be exact) later, and then only spoke to that individual for 2 minutes (JA 685).

Q.     Okay, so you never found it before?

A.     No.

                              …

Q.     Did she tell you that there was another hiring manager in charge of that position?

A.     Yes, and that **she would be the one communicating with her in regards to the position.**

Q.     Okay, so you didn't think that you needed to interview with the hiring manager or talk with the hiring manager at all and get a job in her department?

A.     No; she instructed me to fill out the application.

Q.     Okay.

A.     And that I let her know when I did so.

Q.     Okay.

A.     So she said that she was going to reach out to the hiring manager and talk to her about the lateral move.

Q.     Okay.

A.     And then I didn't hear anything until **I was prompted by Jenn Gillespie to fill out a resignation email**.  **As I did so, I texted her and she said, go ahead and send it to Suzanne, and I will let the manager in the other department know and we'll go from there.**

Q.     Okay, so **she never told you that you were going to get that job, did she**?

A.     **That was her impression to me.**

Q.     Okay, but she never told you that, did she?

A.     **She said that I would do a lateral move.**

Q.     She would talk to the manager about you doing a lateral move?

A.     Right, but **she initiated that I <u>would</u> laterally move to that position.**

Q.     She said, I will reach out to the person who is in charge and talk to them about you potentially making this move?

A.     Right, but **she made it seem like I was going to get the lateral move.**

Q.     Okay.  **That was your perception?**

A.     **That is how she made it out.**

Q.     Okay.  Did she tell you those words, you will get this job?

A.     **She said that it will be a lateral move.**

Q.     Okay, but did she tell you that you would get the job?  I understand that it would be a lateral move, but did she ever tell you, you will get this job, Clara?

16

MS. HADDOX:  Objection, asked and answered.  You may answer it again.

THE WITNESS:  **She just said that it would be a lateral move, and she instructed me what to do, so I did so.**

Q.     Okay.  When did she instruct you and by what means to resign from your position?

A.     She instructed me -- I sent my resignation on November 13th.  **She instructed me a few days before to fill out the email, send it to them, and then <u>she would do the talking with the other manager to have a lateral move done.</u>**

Q.     Okay.  **Did she say why you needed to resign your position before you actually had your job offer?**

A.     <u>**You would have to resign from that job in order to move to a new job.**</u>

Q.     **Okay, and who told you that?**

A.     **Jenn.**

(JA 191-195) [Emphases added].

As the texts confirm, the very next day after Regional Director Gillespie offered to laterally move her to the new position, Ms. Schack applied as instructed and notified Regional Director Gillespie of the same:



Sat, Nov 10, 11:11 AM

Good morning Jenn, I just finished my resume and submitted my application for the HIM position and made sure to put internal transfer in there as well

(JA 498).

When Ms. Schack received a response that the new department needed permission to accomplish the transfer, Regional Director Gillespie stated, "not to do anything, that she would reach out to them" (JA 203).  *See also* JA 499-500:

17



Ms. Schack also submitted her resignation for her current position as instructed, to which Regional Director Gillespie responded that she would let the hiring manager for the HIM Clerk Position in the Medical Records Department, Debbie Sinclair (JA 202; JA 590), know:



(JA 498).

18

As it turns out, Regional Director Gillespie never reached out to Debbie Sinclair to notify her any of this was occurring (JA 600 (Hiring Manager Sinclair has no memory of a conversation with anyone), JA 602 (the first time Hiring Manager Sinclair became aware that Ms. Schack applied for the HIM clerk position was when Parallon's counsel in this matter notified Hiring Manager Sinclair), JA 604-606 (Hiring Manager Sinclair did not hear from Director Caldwell or Regional Director Gillespie concerning Ms. Schack, no one told Hiring Manager Sinclair to consider Ms. Schack for the HIM Clerk position, no one told Hiring Manager Sinclair to place Ms. Schack in the HIM Clerk position, no one informed Hiring Manager Sinclair that Ms. Schack submitted a written resignation in order to be placed in the HIM clerk position, nor did anyone inform Hiring Manager Sinclair that Ms. Schack had submitted a resignation at all); JA 364, 368 (Regional Director Gillespie admitting she never spoke to the hiring manager or recruiter concerning Ms. Schack)).  Similarly, Regional Director Gillespie never reached out to Ericka Strickland — the recruiter who sent Ms. Schack the e-mail that Ms. Schack provided to Regional Director Gillespie (JA 659-660, 663-664 (no one reached out to Recruiter Strickland concerning Ms. Schack applying for the HIM Clerk position)). In short, Regional Director Gillespie took no action to transfer Ms. Schack (*see* JA 606-607) — it was all a devious set up to get rid of Ms. Schack as Regional Director Gillespie was unable to obtain authorization for Ms. Schack's unlawful termination.

19

Thus, Ms. Schack was not transferred, and instead, her employment with Parallon ended (JA 616).

## IV.   STANDARD OF REVIEW

An appellate court "reviews grants of summary judgment *de novo*, applying the same standard as the court below." *Baker v. Baker*, 2019 U.S. App. LEXIS 36648, at *6 (4th Cir. Dec. 11, 2019) (citing *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 817 (4th Cir. 1995)).  The Court must view the evidence in the light most favorable to Appellant to determine whether material questions of fact exist. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanders Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (citation omitted); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1867-68 (reversing summary judgment where "the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion").

## V.   SUMMARY OF ARGUMENT

Clara Schack became pregnant while employed with Parallon in September of 2018.  She developed an ovarian cyst and, thereafter, Hyperemesis Gravidarum (extreme, persistent nausea and vomiting), which progressed to the point she was required to have a permanent IV line placed in her arm to deliver fluids and

necessitated frequent visits from home healthcare. While Ms. Schack nobly attempted to work through her disability, including vomiting in bathrooms at work and then returning to her work duties, her severe condition necessitated a need for accommodations, such as time off from work and shorter shifts. These accommodations, by nature, were only needed for a limited time as her Hyperemesis Gravidarum was pregnancy related and pregnancy, naturally, has an end date. Moreover, in November 2018, Jenn Gillespie, Regional Patient Access Director, advised Ms. Schack that Parallon would move Ms. Schack to another position that would be easier on Ms. Schack while she was pregnant and suffering from pregnancy-related disabilities. Regional Director Gillespie instructed Ms. Schack to submit an application for the new job, to submit a resignation for her current job, and that Regional Director Gillespie would "take care of the rest." Ms. Schack submitted the requested application, Regional Director Gillespie, thereafter, accepted Ms. Schack's resignation without telling anyone that Regional Director Gillespie had requested the resignation, and then, Regional Director Gillespie intentionally failed to take any actions to place Ms. Schack in the promised position, thus resulting in Ms. Schack's employment ending. Unbeknownst to Ms. Schack at the time, Regional Director Gillespie sent numerous e-mails during the time Ms. Schack was requesting accommodations indicating that Regional Director

Gillespie did not want Ms. Schack employed any longer due to the accommodations Ms. Schack's disabilities necessitated.

The district court held the following: "Because the undisputed evidence shows no contract and because Schack's absenteeism places her outside the protection of the laws she has invoked, the court will grant summary judgment to Parallon on all claims" (JA 746).

The district court found that there was "no contract" because Regional Director Gillespie's statement that, if Ms. Schack submitted her application in the system for the new position and submitted her resignation for her current position, Ms. Schack "would laterally move to that position" (JA 193) and that Ms. Gillespie "would do the talking with the other manager to have a lateral move done" (JA 194) was not, as a matter of law, an "offer for an exchange," instead calling it "optimistic statements of Schack's chances at securing the position with Gillespie's help" (JA 755). This is clear error. And, Ms. Schack had no intent of going anywhere, including to any other position (*see* JA 249, lines 4-10). Instead, Ms. Gillespie fraudulently offered this transfer to Ms. Schack as an accommodation for her pregnancy-related disability (JA 261). Trusting Regional Director Gillespie, one of the highest-ranking officials above Ms. Schack, Ms. Schack accepted and detrimentally relied on the offer by submitting the resignation, and Ms. Gillespie, on

behalf of Parallon, blatantly breached when she did not "do the talking with the other manager to have a lateral move done" (JA 194).

Moreover, Clara Schack was terminated *less than 3 months* after her pregnancy-related disability began, *while still engaging in the interactive process with Parallon*.  The district court, therefore, engaged in reversible error holding that Ms. Schack's absences "took her outside the protection" of the Pregnancy Discrimination Act and the Americans with Disabilities Act.

## VI.   ARGUMENT

1.   <u>**Breach of Contract and Fraud in the Inducement**</u>: **Regional Director Gillespie offered to laterally transfer Ms. Schack to another position if she submitted her resignation for her current position; Ms. Schack accepted and submitted her resignation for her current position; Ms. Gillespie did not laterally transfer Ms. Schack to the other position.**

"The elements of breach of contract in Virginia are: '(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'" *Jones v. Fulton Bank, N.A.*, 565 F. App'x 251, 252 (4th Cir. 2014) (quoting *Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 614 (2004)).

"The elements of fraud in the inducement are (1) false representation of material fact; (2) reliance; and (3) inducement to enter the contract." *XL Specialty Ins. Co. v. Truland*, 2015 U.S. Dist. LEXIS 25599, at *11 (E.D. Va. Mar. 3, 2015)

(citing *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 699 S.E.2d 483, 489 (2010) (other citations omitted)).

*Sea-Land Serv., Inc. v. O'Neal*, 224 Va. 343, 297 S.E.2d 647 (1982) controls these claims. In *Sea-Land*, the employer stated that if the employee resigned as sales manager, she would be transferred to the role of teletype operator/messenger. *Id*. at 347, 297 S.E.2d at 649. The employee resigned as sales manager, but the employer failed to transfer her to a teletype operator/messenger role. *Id*. The Virginia Supreme Court held that the employer's offer conditioned upon the employee's resignation was "a contract to exchange jobs," *Id.* at 348, 297 S.E.2d at 650, and "once [the employee] performed her part of the bargain by resigning from the first position, [the employer] became obligated to perform on its part and breached that obligation to her damage when it refused to employ her in the [new] position." *Id.* at 349, 297 S.E.2d at 650. Moreover, the Supreme Court found there was evidence that *Sea-Land* made the offer with the then present intention not to perform, thus the fraud in the inducement claim was to be presented to a jury, as well, even though the offer was to perform a future act. *Id.* at 351-52, 297 S.E.2d at 652; *see also Flowers v. Wal-Mart Stores*, 927 F. Supp. 952, 956 (E.D. Va. 1996) (following *Sea-Land* and denying Walmart's motion for summary judgment on employee's contract and fraud claims when an employee who executed a transfer agreement giving up her position in one Walmart on the unfulfilled promise of employment by another store).

24

The district court here differentiated *Sea-Land* based on the specific words used in making the offer. There is no meaningful difference.

In *Sea-Land*, the supervisor stated that the plaintiff "'could have the other job' if she 'turned the letter [of resignation] in.'" *Sea-Land*, 224 Va. at 347.

Here, the supervisor stated that Ms. Schack "would laterally move to that [new] position" (JA 193, lines 11-12) if she "fill[ed] out the [resignation] email, [and] sen[t] it to them" (JA 194, lines 17-18). In fact, when Ms. Schack was asked whether she understood the HIM Clerk to be "offered to" her, she testified, "yes" (JA 261, lines 1-4), and she also agreed with defense counsel that the position was "promised" (JA 249, line 10).

In both *Sea-Land* and here, the plaintiffs were induced to resign their current positions, when they both desired to stay employed (*see* JA 249, lines 4-10), due to representations made by their superior.

Moreover, Virginia courts favor finding the existence of a contract if there has been partial performance. *Clarke v. Collins*, 73 Va. Cir. 12, 15 (Lynchburg City 2006) ("A contract can be proven by a course of dealing and the conduct of the parties. This is particularly true where there has been partial performance of a contract.") (internal citations omitted); *Reid v. Boyle*, 259 Va. 356, 367, 527 S.E.2d 137, 143 (2000) ("[C]ourts . . . will [not] permit parties to be released from the obligations which they have assumed if this can be ascertained with reasonable

certainty from language used, in the light of all the surrounding circumstances. *This is especially true where there has been partial performance*." (citations omitted) (emphasis added)).  Here, there was partial performance: Clara Schack, while 3 months pregnant and in need of income, resigned a job she had no intention of resigning (*see* JA 249, lines 4-10) to be moved to a different position that would accommodate her until her health improved.

2.    **ADA and PDA Pregnancy-Related Disability Constructive Discharge: Ms. Schack did not miss too much work such that she was not a "qualified" individual.  She was not even terminated, let alone terminated for missing work.**

To establish a prima facie case for disability discrimination under the ADA, a plaintiff must prove: (1) that she has a disability, (2) that she is a "qualified individual" for employment in question, and (3) that her employer discharged her or took other adverse employment action because of her disability. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015).  A constructive discharge…may constitute an adverse employment action. *See Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir. 1984).

*Lacasse v. Didlake, Inc.*, 712 F. App'x 231, 238-39 (4th Cir. 2018).

a.    **Adverse Act: Ms. Schack's involuntary resignation based on Regional Director's misrepresentation and/or deception constitutes constructive discharge.**

A resignation based on a misrepresentation or deception constitutes constructive discharge.  *King v. Blanchard Mach. Co.*, 2012 U.S. Dist. LEXIS 141201, at *20 (D.S.C. Sep. 28, 2012) (citing *Stone v. University of Maryland Medical System Corp.*, 855 F.2d 167, 172 (4th Cir. 1988) for the proposition that

constructive discharge is proven when an employee involuntary resigns based on employer's misrepresentation or deception as it prevented the employee from making a free and informed choice). This "misrepresentation or deception" test does not require a binding "contract," as erroneously assumed, without authority, by the district court (JA 756). "The focus in a constructive discharge case is whether the conduct of the employer caused the employee to involuntarily resign." *King*, 2012 U.S. Dist. LEXIS 141201, at *20. Here, Ms. Schack involuntarily resigned due to Regional Director Gillespie's misrepresentation and/or deception, and Ms. Schack was "upset" (JA 249, line 4), "felt betrayed" (JA 249, line 4), and "like she was lied to the entire time" (JA 249, lines 4-5), once she "got the letter from HR that said other candidates were being considered for the [HIM Clerk] job," and thus, indicating that Ms. Schack was not being placed in the HIM Clerk position (JA 249, lines 23-24). Ms. Schack was deprived of the opportunity to make a free and informed choice and had no intent in resigning except to be moved to another position, and as such, has created a question of fact regarding whether she suffered an adverse act.

      b.   **<u>Disabled or Regarded as Disabled:</u> Regional Director Gillespie admitted that she regarded Ms. Schack as disabled, and Ms. Schack is protected by the plain language of the PDA.**

Even though Ms. Schack is disabled (*infra*), that question need not be reached for this claim as Regional Director Gillespie admitted that she regarded Ms. Schack

as disabled (*E.g.*, JA 288 (Ms. Gillespie admitting that Ms. Schack's absences were "ADA covered leaves")). *West v. J.O. Stevenson, Inc.*, 164 F. Supp. 3d 751, 774 (E.D.N.C. 2016) ("'an individual is 'regarded as' disabled, and thus is a 'qualified individual with a disability,' where 1) [s]he is actually impaired and h[er] employer knows of that impairment or 2) h[er] employer perceives h[er] to be impaired" (citing 42 U.S.C. § 12102(3)(A); 29 C.F.R. § 1630.2(l) & (app.)).

Ms. Schack's pregnancy-related condition is also protected pursuant to the plain language of the PDA, which amended Title VII of the Civil Rights Act of 1964 to expand the definition of "sex" to include pregnancy ***and related conditions***. *E.g.*, *Shepherd v. Geo. W. Park Seed Co.*, 2008 U.S. Dist. LEXIS 76636, at *1 (D.S.C. Aug. 26, 2008) (citing 42 U.S.C. § 2000e(k)) [Emphasis added].

### c.    <u>"Qualified"</u>: Parallon conceded at oral argument that "Parallon believed [Ms. Schack] could perform her duties."

Parallon conceded at oral argument that "Parallon believed [Ms. Schack] could perform her duties" (JA 695). Yet, despite this concession, the district court held that Ms. Schack could not perform her job duties due to her absenteeism (JA 757-758).

Moreover, the district court held that Ms. Schack missed 27 of the 70 shifts she was scheduled for (JA 757). This is factually inaccurate. Plaintiff was not

scheduled for 70 shifts, and Ms. Schack did not miss 27 days.[3]  First, the district court could not know how many days Ms. Schack was scheduled from mid-July 2018 until mid-August 2018, because Ms. Schack was in training, and, therefore, was not added to the schedule for that period (JA 729).  The record does establish that Ms. Schack worked 18 days from mid-July until mid-August 2018 (JA 689).[4] Again, it is unknown how many shifts Ms. Schack was scheduled for, but it is believed it was 19 shifts (*see* JA 691).  Then, from mid-August until mid-September 2018, Ms. Schack worked 12[5] (JA 689-690) out of her 14 days scheduled (JA 730), **missing only two days this month** despite significant medical issues. Then, from mid-September to mid-October 2018, Ms. Schack worked 4[6] (JA 690) out of her 12 days scheduled (JA 278), but this was the period in which Ms. Schack was on a two-week approved ADA leave getting her permanent IV line placed (JA 275), which covered 6 of the days she missed (JA 278); thus, Ms. Schack **only missed 2 days this month** that were not covered by her physician's note (JA 278; JA 275).  Then,

---

[3] The handwritten note that Parallon relied upon to indicate that Ms. Schack missed 27 days (JA 691), and apparently upon which the district court relied, is not accurate to the records that were generated by Parallon's electronic calendar (JA 278-279) and time-clock system (JA 688-690).  For example, the handwritten note indicates that Ms. Schack missed October 27, 2018 (JA 691).  Yet, Ms. Schack was not scheduled to work on October 27, 2018 (JA 279).

[4] July 23, 24, 25, 26, 27, 30, 31, August 2, 3, 6, 7, 8, 9, 10, 13, 14, 15, and 16 (JA 689).

[5] August 20, 22, 23, 24, 25, 27, 28, 30, September 4, 11, 12, 14 (JA 689-690).

[6] September 16, 19, 20, 25 (JA 690).

finally, mid-October to mid-November 2018, Ms. Schack worked 6[7] of her scheduled 12 days (JA 279), **missing 6 days this month, but during a time she had requested the accommodation of shorter shifts, which could have been accommodated, but was denied**.  Assuming that Ms. Schack was scheduled for 19 days during the first month while she was in training, Ms. Schack was only scheduled 57 shifts, and she worked and/or had ADA approved leave for 46 of those shifts, missing only 11 days, all while not being accommodated with shorter shifts and/or a transfer to another position.

And, again, Ms. Schack was terminated *in less than 3 months* after her pregnancy-related disability began, *while still engaging in the interactive process with Parallon*.

Continuing, "[t]he ADA Amendments Act of 2008 ('ADAAA') …was passed to 'reinstat[e] a broad scope of protection to be available under the ADA.'" *J.D. v. Colonial Williamsburg Found.*, 925 F.3d 663, 670 (4th Cir. 2019) (citing *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014) (quoting Pub. L. No. 110-325, § 2(b)(1), 122 Stat. 3553)); *Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869, 875 (4th Cir. 2020) (cautioning against applying disability claims under outdated standards).

---

[7] October 16, 18, 20, 21, 29, 30 (JA 690).

The district court's reliance on a case that predates the ADA Amendments, *Tyndall v. National Educ. Ctrs.*, 31 F.3d 209, 211 (4th Cir. 1994), is therefore misplaced. *Tyndall*, moreover, is distinguishable, and the proposition it stands for is not applicable here:

1.  Tyndall was fired for attendance issues; Ms. Schack was not fired at all, let alone for attendance issues. In fact, Regional Director Gillespie informed Ms. Schack on November 7, 2018 (JA 264; JA 685), only nine days before Ms. Schack was notified she was not being placed in the HIM Clerk Position (JA 616), "that she would get with Lisa and Suzanne and she would excuse my absences as well as create a plan, and she actually told me – she asked me if I needed some more time off, and she told me that she would let Lisa and Suzanne know I would not be there for my next shift" (JA 183).

2.  Tyndall was terminated by the same individual who "had hired her with full knowledge of her disability only two years earlier." *Tyndall*, 31 F.3d at 211. Ms. Schack was not pregnant when she was hired, and, again, she was not fired.

3.  Tyndall was accommodated: "During Tyndall's tenure at Kee, the school made every effort to accommodate her lupus condition. Kee permitted Tyndall to take sick leave, to come into work late or leave

early, and to take breaks from ongoing classes whenever she felt ill. If Tyndall became ill during the work day, Seay and other colleagues would accompany her to the rest room to help her, and would offer her a ride home. Indeed, Tyndall admitted that she never made a request for accommodation of her lupus condition that Kee refused." *Id.* Here, Ms. Schack was not accommodated with the shorter shifts she requested, she never got the transfer she was promised, and she vomited in work bathrooms alone and then returned to work.

4.     "Tyndall missed almost forty days of work during a seven-month period." *Id.*at 213, predominately for her *son's* medical condition, which is ***not*** protected by the ADA:

Furthermore, Kee's extensive accommodations of Tyndall's lupus condition did not improve her attendance level. From the beginning of Tyndall's tenure at Kee, Seay permitted her to take sick leave, come into work late, leave early, and take mid-class breaks when necessary to alleviate her condition. Despite the numerous attempts to assist her, Tyndall continued to miss an excessive number of days from work. Indeed, Kee's accommodations of Tyndall's disability could not have significantly improved Tyndall's attendance level, as a majority of her absences were not related to her own disability. Rather, they were caused by her personal need to tend to her son's disability, which an employer is not obligated to accommodate through scheduling modifications. *See* 29 C.F.R. § 1630, App. ("An employee would not be entitled to a modified work schedule as an accommodation to enable the employee to care for [a family member] with a disability."). Because Tyndall's attendance problems rendered her unable to fulfill the essential functions of her job, and because these problems occurred even with Kee's more than reasonable accommodations for her own

disability, we hold that she was not a "qualified individual with a disability," as required by § 12112(a) of the ADA.

*Id.* at 214. Ms. Schack missed significantly fewer days, while not being accommodated, and, except for missing *one day* for her grandfather's medical condition, Ms. Schack missed work only for her own protected disability. As numerous courts have held, the lack of accommodation differentiates cases such as Ms. Schack's from *Tyndall*. *E.g.*, *Torres v. Hilton Int'l of P.R., Inc.*, 2012 U.S. Dist. LEXIS 91436, at *12-14 (D.P.R. July 2, 2012) (finding that because the plaintiff, who was bipolar, was not accommodated, the record lacked evidence that the plaintiff's attendance issues would have continued has she received reasonable accommodation); *Pettus v. Am. Safety Razor Co.*, 2001 U.S. Dist. LEXIS 6968, at *11-14 (W.D. Va. Mar. 29, 2001) (noting that even though the defendant now argued the plaintiff was not qualified due to her absenteeism, it had not terminated plaintiff due to her absenteeism).

In short, the district court, in error, (1) considered only whether Ms. Schack could perform "her job as a registrar" (JA 757), despite the fact that Ms. Schack was also offered the HIM Clerk position by Regional Director Gillespie, (2) failed to consider whether Ms. Schack could have performed her position or an open position with a reasonable accommodation, such as shorter shifts, and (3) applied a case that applies in situations in which the plaintiff was terminated for absenteeism, which is not the case here.

3. **ADA and PDA Failure to Accommodate: Whether Ms. Schack was "qualified" at the time she was tricked into resigning is not relevant to whether she should have been accommodated prior to that time when her physician suggested the accommodation of shorter shifts. Moreover, there is not sufficient evidence for the district court to have assumed that Ms. Schack could not have performed the HIM Clerk position, especially when Parallon admitted Ms. Schack was qualified for the position**.

In a failure-to-accommodate case, a plaintiff establishes a *prima facie* case by showing:

> (1) that [s]he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of h[er][] disability; (3) that with reasonable accommodation [s]he could perform the essential functions of [a] position . . . ; and (4) that the [employer] refused to make such accommodations.

*Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 n. 11 (4th Cir. 2001) (citation omitted). It is well-established that the questions concerning disability, qualification, and accommodation each require an individualized inquiry. *E.g.*, *Bragdon v. Abbott*, 524 U.S. 624, 641-42 (1998).

a. **Disability: Regional Director Gillespie admitted that, based on the form provided by Ms. Schack's physician, Ms. Schack was entitled to ADA protection.**

Regional Director Gillespie admitted that, based on the form provided by Ms. Schack's physician, Ms. Schack was entitled to ADA protection (JA 292); Parallon is, therefore, estopped from arguing otherwise herein.

34

> **b.** **Notice:** **Ms. Schack notified HR that she had "a medical condition which was impacting [her] pregnancy" and requested a reasonable accommodation, and Regional Director Gillespie admitted she knew the formal diagnosis of Ms. Schack's disability was Hyperemesis Gravidarum.**

Regional Director Gillespie and Supervisor Caldwell were aware of the serious symptoms from which Ms. Schack was suffering (JA 337-338, 346; JA 451, 455-458), and likewise were aware that the formal diagnosis for such a condition is Hyperemesis Gravidarum (JA 350). Moreover, Ms. Schack specifically notified HR Manager Spencer-Bennett that she "had a medical condition which was impacting [her] pregnancy" and requested a reasonable accommodation (JA 159-160). And, again, Regional Director Gillespie acknowledged that she understood that this entitled Ms. Schack to ADA protection (JA 292), and that Ms. Schack's absences were ADA covered absences (JA 288).

> **c.** **Performing Essential Functions of an Open Position and Denial of Reasonable Accommodation:** **Ms. Schack could have performed her position with the reasonable accommodation of shorter shifts and/or could have performed the position of HIM Clerk. Ms. Schack's request for shorter shifts was denied, and it is undisputed that she was never placed in the HIM Clerk position.**

Ms. Schack requested the accommodation of shorter shifts for a limited duration. Ms. Schack's physician was the source of this request, which HR Manager

Spencer-Bennett acknowledged (JA 297; JA 260, lines 5-9).[8] Thereafter, for the several weeks Parallon let Ms. Schack remain employed, Ms. Schack's shifts were *lengthened*, not shortened (*compare* JA 278 *to* JA 279). Thus, again, despite another falsehood by Regional Director Gillespie, the fact remains from the evidence in this case that Ms. Schack was not accommodated in this regard:

*Compare Regional Director Gillespie's Story:*

> Q.    What was your role with respect to determining whether or not Ms. Shack would be provided shortened shifts?
> A.    My direction to Suzanne [Caldwell] was the best that we can do to accommodate her is what we need to do.

(Ex. 22, at 75).

*To Manager Albert's testimony:*

> Q.    Do you recall whether you were told to accommodate Ms. Shack in the form of scheduling her for shorter shifts at any time?
> A.    I don't recall that.

(Ex. 23, at 37-38).

---

[8] Moreover, not all accommodation requests need to be supported by a doctor's note (Ex. 20; Ex. 31, at 46-47; *see* Ex. 22, at 45-46). Further, Regional Director Gillespie specifically notified Ms. Schack in November 2018 that Ms. Schack need-not do anything else for her accommodation requests as "it would all be taken care of per her [Regional Director Gillespie]" (JA 190).

36

*To the written evidence:*

| From: | Gillespie Jenny |
|---|---|
| Sent: | Monday, October 15, 2018 11:33 AM |
| To: | Spencer-Bennett Harriett |
| Cc: | Caldwell Suzanne |
| Subject: | Clara Schack |
| | |
| Importance: | High |

Good Morning, Harriett,

Clara Schack reached out to Suzanne this am to ask for additional accommodation (not to be scheduled more than 5-6 hours per shift); we sent her in your direction. We cannot support any additional accommodations at this point and Clara will be scheduled as needed.

Please advise if you need to talk – Thanks.

**Jenn Gillespie**
**Regional Director, Patient Access**
**Parallon Business Performance Group**
C: 540.315.0317
P: 540.776.4745
Jennifer.Gillespie@parallon.com
www.parallon.com



**PARALLON**

Ms. Schack also could have been accommodated with a transfer to another position. In fact, within the interactive process, Regional Director Gillespie offered the reasonable accommodation of a transfer to the HIM Clerk position, yet failed to follow through providing the accommodation to Ms. Schack:

> Q. Did you understand the move to the HIM Clerk position to be an accommodation that was being offered to you?
> A. Yes.
> Q. But ultimately, you were not placed in that position, correct?
> A. Correct.

(JA 261).

Recruiter Strickland admitted that Ms. Schack was qualified for the HIM Clerk position or Recruiter Strickland would not have sent the email to Ms. Schack concerning permission to speak to Ms. Schack's supervisor about the transfer (JA 661; *see also* JA 594-595 (Hiring Manager Sinclair describing the HIM Clerk position responsibilities — all tasks Ms. Schack clearly could perform or could easily be trained to perform)). And, Regional Director Gillespie admitted that it was "[a]bsolutely" true that going outside normal policy and procedure, such as the transfer policy and procedure, to accommodate an individual is part of the ADA (JA 390).

As Parallon offered the transfer as a reasonable accommodation and never requested a medical note concerning the transfer, Parallon is estopped from arguing now that the lack of a note from Dr. Zolovick concerning the transfer justifies Parallon's bait-and-switch and failure to accommodate. *See Edwards v. Montgomery Coll.*, 2018 U.S. Dist. LEXIS 173325, at *3-5, 34-35 (D. Md. Oct. 9, 2018) (denying motion to dismiss on failure to accommodate claim even though the employer accommodated all requests made by plaintiff's physician and only failed to accommodate requests made thereafter by plaintiff, which plaintiff never provided a doctor's note to support).

In conclusion, failing to accommodate Ms. Schack in both these regards, and instead fraudulently inducing her resignation, creates questions of fact as to whether Parallon failed to accommodate Ms. Schack in violation of both the PDA and ADA.

## VII. CONCLUSION

After failing to accommodate Ms. Schack upon her return from her short ADA and PDA protected leave, Regional Director Gillespie machinated to get rid of Ms. Schack.  Regional Director Gillespie, as demonstrated by the emails, tried multiple times to escalate this situation towards termination quickly, including attempting to lengthen Ms. Schack's probationary period, which would make it easier to terminate Ms. Schack's employment pursuant to the attendance policy (District Court Dkt. No. 44, pageid#223, ¶3), but the legal department became involved, and human resources consistently demanded lesser action be taken than what Regional Director Gillespie desired.  And, as Regional Director Gillespie testified, terminations had to be cleared by human resources and the COO (JA 328). Thus, Regional Director Gillespie took the matter into her own hands — when Regional Director Gillespie's efforts failed, she found another way to get rid of Ms. Schack: a con.

As one district court has explained,

… "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v.*

*EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).

*Myers v. Hog Slat, Inc.*, 2014 U.S. Dist. LEXIS 152649, at *27-28 (N.D. Iowa Oct. 24, 2014) (quotation omitted).  For all the reasons stated herein, the district court erred, the district court's February 8, 2021, Order should be reversed, and the case should be remanded to the district court for further proceedings.

## VIII.  REQUEST FOR ORAL ARGUMENT

On behalf of the Appellant, we hereby request oral argument.

Respectfully Submitted,

/s/ Brittany M. Haddox
Brittany M. Haddox
Thomas E. Strelka
Strelka Employment Law
119 Norfolk Avenue, SW, Suite 330
Roanoke, Virginia  24011
(540) 283-0802

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*8,063*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>June 25, 2021</u>                    <u>/s/ Brittany M. Haddox</u>
                                                        *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 25th day of June, 2021, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users:

/s/ Brittany M. Haddox
*Counsel for Appellant*