RECORD NO. 21-1201

In The
# United States Court of Appeals
### For The Fourth Circuit

## CLARA SCHACK,

*Plaintiff – Appellant,*

**v.**

## PARALLON ENTERPRISES, LLC,

*Defendant – Appellee,*

**and**

## LEWIS-GALE HOSPITAL, INCORPORATED; HCA - THE HEALTHCARE COMPANY; MONTGOMERY REGIONAL HOSPITAL, INC.,

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA AT ROANOKE**

———————————

**BRIEF OF APPELLEE**

———————————

**Susan Childers North**
**Brett C. Herbert**
**GORDON REES SCULLY MANSUKHANI, LLP**
**5425 Discovery Park Boulevard, Suite 200**
**Williamsburg, Virginia  23188**
**(757) 903-0870**

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-1201__      Caption: __Clara Schack v. Parallon Enterprises, LLC, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Parallon Enterprises, LLC__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.   Does party/amicus have any parent corporations?  ☑YES ☐NO
     If yes, identify all parent corporations, including all generations of parent corporations:

      EP Health, LLC
      SSHR Holdco, LLC
      Parallon Holdings, LLC

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Susan Childers North          Date:      03/05/2021

Counsel for: Parallon Enterprises, LLC

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

I.     JURISDICTIONAL STATEMENT ............................................... 1

II.    STATEMENT OF ISSUES ......................................................... 1

III.   STATEMENT OF THE CASE ...................................................... 2

      RELEVANT FACTS ............................................................. 2

      DISTRICT COURT'S OPINION ............................................ 10

IV.   SUMMARY OF THE ARGUMENT ........................................... 12

V.    ARGUMENT ........................................................................ 16

     1.    Standard of review ................................................... 16

     2.    The District Court did not err in finding that no contract or fraudulent inducement existed in this matter ...................... 19

     3.    The District Court did not err in finding no adverse action existed to support Schack's ADA and PDA discrimination claims ............... 26

     4.    Schack never raised the issue of being a "qualified individual" at the trial court below, and she should be precluded from raising such issue for the first time on appeal ................................. 29

     5.    The District Court correctly found that Schack is not a qualified individual who could perform the essential duties of her job with or without reasonable accommodation ............................... 33

     6.    Summary judgment against Shack's failure to accommodate claim was properly granted .............................................. 37

VI.     CONCLUSION...............................................................................41

VII.    APPELLANT'S POSITION ON ORAL ARGUMENT ..............................41

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Albanese v. WCI Communities, Inc., and WCI Mid-Atlantic U.S. Region, Inc.,
     530 F. Supp. 3d 752 (E.D. Va. 2007 ......................................................19, 23

Anderson v. Liberty Lobby, Inc.,
     477 U.S. 242 (1986)...............................................................................17, 18

Bragg v. Orthopedic Associates of Virginia,
     No. 2:06-cv-347, 2007 U.S. Dist. LEXIS 14836 (E.D. Va. Mar. 2, 2007)....17

Brooks v. Micron Technology, Inc.,
     2010 WL 11695207,
     Civil Action No. 1:09-cv-679 (E. D. Va. June 2, 2010)...............................37

Bryant v. Yorktowne Cabinetry, Inc.,
     548 F. Supp. 2d 239 (W.D. Va. 2008)..........................................................19

Celotex Corp. v. Catrett,
     477 U.S. 317 (1986).....................................................................................17

Chang v. First Colonial Sav. Bank,
     410 S.E.2d 928 (Va. 1991) ...........................................................................19

Colonial Ford Truck Sales v. Schneider,
     228 Va. 671, 325 S.E.2d 91 (1985) ..............................................................23

Diamond v. Bea Maurer, Inc.,
     128 Fed. Appx. 968 (4th Cir. 2005) .............................................................19

Dodge v. Trustees of Randolph-Macon Woman's College,
     276 Va. 1, 661 S.E.2d 801 (2008) ................................................................22

Evans v. Int'l Paper Co.,
     936 F.3d 183 (4th Cir. 2019) ........................................................................27

Evans v. Technologies Applications & Service Co.,
    80 F.3d 954 (4th Cir. 1996) ............................................................18

Fleischman v. Cont'l Cas. Co.,
    698 F.3d 598 (7th Cir. 2012) ........................................................30

Gill v. TBG Food Acquisition Corp.,
    2020 WL 3869569,
    Civil Action No. 7:19-cv-00479 (W.D. Va. July 9, 2020) ............................27

Goodman v. Diggs,
    986 F.3d 493 (4th Cir. 2021) ............................................................16

Green v. Brennan,
    136, S. Ct. 1769 (2016) .................................................................27

Griffin v. Prince William Health Sys.,
    2011 WL 1597508, 01:10-cv-359 (E.D. Va. Apr. 26, 2011) ........................38

Hansberry v. Computer Engineering Sys. Group,
    1998 WL 539945, No. 97-1890 (E.D. Va. July 29, 1998) ..................... 37-38

Harris v. Reston Hosp. Center, LLC,
    523 F. App'x 938 (4th Cir. 2013) ..................................................31

Holly Hill Farm Corp. v. United States,
    447 F.3d 258 (4th Cir. 2006) .........................................................30

In re Diet Drugs Prod. Liab. Litig.,
    706 F.3d 217 (3d Cir. 2013) ...........................................................30

In re Under Seal,
    749 F.3d 276 (4th Cir. 2014) .....................................................29, 30

Jeandron v. Bd. Of Regents of the University System of Md.,
    510 Fed. Appx. 223 (4th Cir. 2013) ........................................ 18-19

Jones v. Constellation Energy Projects & Servs., Grp., Inc.,
    629 Fed. Appx. 466 (4th Cir. 2015) .............................................29

Judicial Inquiry and Review Commission of Va. v. Elliott,
    272 Va. 388, 410 S.E.2d 928 (1991) ............................................................22

King v. Blanchard Mach. Co.,
    No. CA 3:10-3219-MBS, 2012 WL 4586177 (D.S.C. Sept. 28, 2012) ........25

Lamb v. Qualex, Inc.,
    33 F. Appx. 49 (4th Cir. 2002) ..........................................................34, 37, 38

Lissmann v. Hartford Fire Ins. Co.,
    848 F.2d 50 (4th Cir. 1998) ........................................................................23

Malghan v. Evans,
    118 Fed. Appx. 731 (4th Cir. 2004) ............................................................19

Matsushita Elec. Indus. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)....................................................................................18

Perrin v. Fennell,
    2011 WL 837008, 1:10-cv-810 (E.D. Va. Mar. 2, 2011).  ....................38, 40

Posante v. Lifepoint Hosps., Inc.,
    No. 4:10-cv-00055, 2011 WL 3679108 (W.D. Va. Aug. 23, 2011) .............34

Progressive Constr. Co. v. Thumm,
    209 Va. 24 161 S.E.2d 687 (1968) ..............................................................22

Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.,
    673 F.3d 294 (4th Cir. 2012)......................................................................16

Reyazuddin v. Montgomery Cty., Md.,
    789 F.3d 407 (4th Cir 2015) .......................................................................37

Sea-Land Service, Inc. v. O'Neal,
    297 S.E.2d 647 (1982)..........................................................................20, 21

Smith v. Farrell,
    199 Va. 121, 98 S.E.2d 3 (1957) .......................................................19, 20, 22

Southeastern Community College v. Davis,
 442 U.S. 397 (1979)......................................................... 33-34

Spriggs v. Diamond Auto Glass,
 242 F.3d 179 (4th Cir. 2001).........................................17

Tchankpa v. Ascena Retail Grp., Inc.,
 951 F.3d 805 (6th Cir. 2020) ........................................39

Tyndall v. Nat'l Educ. Centers, Inc. of California,
 31 F.3d 209 (4th Cir. 1994) ....................................33, 34

Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.,
 386 F.3d 581 (4th Cir. 2004) .........................................30

Waggoner v. Olin Corp.,
 169 F.3d 481 (7th Cir. 1999) ...................................16, 34

Walders v. Garrett,
 765 F. Supp. 303 (E.D. Va. 1991) ................................34

Ward v. McDonald,
 762 F.3d 24 (D.C. Cir. 2014)....................................39, 40

Ware v. Scott,
 257 S.E.2d 855 (Va. 1979) ................................14, 22, 23

Wells v. BAE Sys. Norfolk Ship Repair,
 483 F. Supp. 2d 497 (E.D. Va 2007) aff'd,
 Wells v. Bae Sys. Norfolk Ship Repair,
 250 F. Appx. 552 (4th Cir. 2007) .................................38

Wilburn v. City of Roanoke,
 2015 WL 5089243,
 Civil Action No. 7:14-cv-00255 (W.D. Va. Aug. 27, 2015).........................37

Wood v. Milyard,
 566 U.S. 463, 132 S. Ct. 1826, 182 L. Ed. 2d 733 (2012) ............................30

**STATUTES**

28 U.S.C. § 1291 ....................................................................................1

42 U.S.C. § 12111 ..................................................................................33

42 U.S.C. § 12112 ..................................................................................37

**RULES**

Fed. R. App. P. 4(a)(1)(A) ......................................................................1

Fed. R. Civ. P. 56 ..................................................................................17

Fed. R. Civ. P. 56(e)(2) .........................................................................18

**REGULATION**

29 C.F.R. § Pt. 1630 ..............................................................................39

## I.  JURISDICTIONAL STATEMENT

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1291 because this is an appeal from a "final decision" by the United States District Court for the Western District of Virginia (the "District Court"). Specifically, subject matter jurisdiction is met because this case originated in the District Court, allowing for appellate jurisdiction pursuant to 28 U.S.C. § 1291. This appeal is timely, as judgment on the summary judgment order subject to the appeal was entered on February 8, 2021 ("Order"), and Appellee Clara Schack ("Appellee" or "Schack") filed her Notice of Appeal with the Fourth Circuit on February 22, 2021, less than thirty days after entry of judgment.  See Fed. R. App. Proc. 4(a)(1)(A).

## II.  STATEMENT OF ISSUES

1.  The District Court did not err in finding that Schack provided no evidence demonstrating the existence of an enforceable contract with Parallon or any fraud related thereto.

2.  The District Court did not err in finding that Schack was not a qualified individual and in granting summary judgment on each of Schack's claims under the Americans with Disabilities Act, as amended ("ADA") and under the Pregnancy Discrimination Act ("PDA").

## III.    STATEMENT OF THE CASE

## RELEVANT FACTS

Schack applied for a part-time registrar position and interviewed with Suzanne Caldwell, Patient Access Director, and Lisa Albert, Patient Access Manager.  Deposition Transcript of Clara Schack (JA 130). Schack was informed that the position involved someone working as a registrar 24 hours, seven day a week, 365 days a year (JA 130-131, 446-449). Schack was expected to work 25-30 hours per week. (JA 131, 449)  Ms. Caldwell and Ms. Albert hired Schack and they were her supervisors throughout her employment.  (JA 131-132, 446). Ms. Albert reported to Ms. Caldwell and Ms. Caldwell reported to Regional Director Jennifer Gillespie ("Gillespie") (JA 132). In accepting Parallon's offer, Schack agreed to abide by all of Parallon's policies and procedures (JA 40-41, 133).  If she failed to do so, she understood that disciplinary action could be taken against her (JA 133). She also signed a job description and agreed to perform all the duties to the best of her ability (JA 134-135. Significantly, Schack admits she agreed to and signed Parallon's Patient Access Internal Attendance and Tardiness Policy (JA 42-44, 135-138). It states she is expected to arrive to and be ready for work at her start time and it defines an occurrence as an unscheduled absence. Id. It also states the first 90 days is a probationary period and if an employee gets one occurrence during this time, it results in a verbal warning, and if someone has two occurrences during the 90-day

period, it will result in a written warning. Id. The policy also states that three occurrences in this 90-day period can result in termination from employment. Id. The policy also requires that "[a]n employee must notify her Manager or Director (by phone) at least two hours prior to the start of the scheduled work shift of any intended absences.  Email notification is not acceptable.  If the Manager or Director is not available, a voicemail message with a contact phone number will be accepted." Id.  "Failure to notify will result in disciplinary action and employees who demonstrate a pattern of not completing their scheduled shift will be subject to disciplinary action." Id. Schack also admits she received the Employee Handbook which reiterated the attendance policy and which stated regular attendance was mandatory and that employees could receive Corrective Actions as a form of discipline (JA 45, 48, 138-142). Schack admits she knew and understood the company's Corrective Action Policy that she was expected to perform satisfactorily or she could receive discipline (JA 52, 83-86, 140-142).

For approximately the first four weeks, Schack was in training so she was not scheduled as a registrar assisting patients (JA 142-143). The first time she was scheduled to work as a registrar was on the 8/19/18-9/15/18 schedule (JA 88, 146-148, 226). Each schedule contained about a month's worth of days scheduled. Id. Before Schack informed Ms. Albert and Ms. Caldwell that she was pregnant, Schack admits she had been  scheduled to work six shifts ending in the evening at 7:30 pm

and for two shifts working late at night between 5:00 p.m.-midnight or 1:30 a.m. Id. On August 30, 2018, Schack informed Ms. Albert and Ms. Caldwell she was pregnant while they were sitting in Ms. Caldwell's office (JA 148-149). The next schedule that came out was for the 9/16/18-10/13/18 time-period (JA 89, 145, 149-150). The next schedule that came out was for the 10/14/18 -11/110/18 time-period (JA 90, 151-153). Schack admits that after she informed management she was pregnant, she was scheduled to work in the evening less than she had previously including only two times on the 9/16-10/13 schedule and only one time in the evening and one time late at night on the 10/14-11/10 schedule (JA 89, 90, 145-153, 226-230). Schack was not scheduled to work late more after she announced she was pregnant and after she returned from her two-week leave. Id.

Schack admits that within the first two-weeks of her employment while still in training, she called out of work on August 1, 2018 (JA 153). Schack admits this was considered an "occurrence" under the Attendance policy for which she received a warning on or about August 7, 2018 (JA 91, 153-155). Schack understood that a second occurrence during her ninety-day probation period would result in a written warning a third occurrence could result in termination from employment (JA 42-44, 154-155). Importantly, this occurred prior to her announcement that she was pregnant (JA 155). Ms. Caldwell discussed the attendance and call-out policy with Schack again and this included stating that texting is not appropriate because the

messages are not always received in time because the managers are with patients, for example (JA 477-478). Schack called in late on September 4, 2018 and called out of work on September 6, 2018, both without a supporting doctor's note, but she was not written-up (JA 155-156). Ms. Caldwell again met with Schack and explained the attendance policy to Schack again and Ms. Caldwell encouraged Schack to contact human resources to request assistance if she needed medical leave or other assistance (JA 156, 479). However, Schack called out again without a supporting doctor's note on September 13, 2018 (JA 157). Thereafter, Schack finally contacted Harriett Spencer-Bennett in human resources who informed Schack it seemed like Schack needed a medical leave as a reasonable accommodation and she provided Schack with information about how to take medical leave and she gave Schack the proper forms to be completed by Schack's medical provider and returned by September 24, 2018 (JA 92-93, 157-158). Schack called out of work on September 18th, 24th, 27th and October 1, 2018 (JA 163). She also failed to return any doctor's note or the request for accommodation form by September 24, 2018 and, as a result, Ms. Spencer-Bennett contacted Schack and extended the date by which to submit a doctor's note to October 1, 2018 and emailed Schack to reiterate this information (JA 94, 95, 160-163).

Ms. Spencer-Bennett received a doctor's note for Schack on October 3, 2018 which the doctor signed on September 28, 2018 (JA 96, 97, 162-167). Schack's

doctor excused Schack from work only for fourteen (14) days effective September 28, 2018 and he did not excuse any of Schack's absences prior to September 28, 2018. Id. Schack requested that her doctor excuse dates prior to September 28, 2018 but he did not do so. Id. Based on this doctor's note, Parallon excused Schack from work for fourteen days from September 28, 2018 and Schack was scheduled to return to work on October 16, 2018 (JA 97, 164-167). Critically, Schack knew she had incurred over three occurrences during her probationary period before she submitted her doctor's note and the note did not excuse any of her prior absences. Id. Schack knew she could have been terminated from employment for this reason but, instead, Ms. Spencer-Bennett excused all of Schack's absences. Id.

On October 15, 2018 at about 8:41 a.m., Schack emailed Ms. Spencer-Bennett and stated that she could not return to work because of her medical condition and that she was in touch with her doctor to provide a doctor's note (JA 98, 169-170, 206-207). About two hours later, Schack email Ms. Spencer-Bennett again stating that she had spoken with her doctor and they decided not to do any more time off (JA 99, 169-170). Schack asked for reduced shifts and Ms. Spencer-Bennett informed Schack that the company needed a doctor's note supporting this request (JA 58-59, 100). Schack's doctor declined to make such as request (JA 59, 235-236, 255-256). Schack returned to work on October 16, 2018 but called out on October 25, 2018 because of a family emergency which Schack admits had nothing to do

6

with her medical condition (JA 172). Schack admits not showing up for her shift on October 26, 2018 (JA 173-174). She found a replacement but she did not tell anyone about it. Id. Schack called out again on November 1, 2018 but it had nothing to do with her medical condition and again she texted which she admits was against policy (JA 174-175). Schack admits her October 25 and 26, and November 1, 2018 absences were unexcused and she was accumulating unexcused absences. Id. Schack also called out on November 3 and 6, 2018 without following the call out of work instructions and she provided no doctor's note because her doctor said he would not give her such a note (JA 174-175, 183, 235-236, 255-256).

On November 7, 2018, Schack received an email from Ms. Albert and Ms. Caldwell containing a written form of discipline called a Corrective Action (JA 101, 102, 176-181). It was not a final written warning and it was not a termination. Id. Schack admits she was being written-up for missing scheduled shifts without a supporting doctor's note and for not using the proper call-out procedures. Id. Schack admits she knew the proper process to use. Id. Schack was also informed she had several uncompleted training courses required for her job and that her productivity was unsatisfactory because registrars were expected to complete 40 registrations per eight-hour shift and she had only recently registered 6 patients between 8:00 a.m. and 1:00 p.m. Id. The Corrective Action stated she needed to improve her performance. Id.

7

Schack agreed her productivity was unsatisfactory (JA 189). Schack also admits that even though she texted her managers about some of her absences, this was not in accordance with policy. Id.  After receiving the Corrective Action, Schack spoke to Gillespie (JA 182).  Gillespie talked to Schack about moving to another position within Gillespie's department that may be better suited for Schack because she had open "PRN" or "schedule as needed" positions open that did not require Schack to work a certain number of hours per week (JA 295-296, 351, 362-363, 374).  Instead of accepting this opportunity, on November 10, 2018, Schack applied for a medical records position located in a completely different department over which Gillespie had no authority and which was full-time (JA 191-194, 203-204, 374).  Schack admits that Gillespie did not specifically tell her that Schack would get the medical records position and no text messages to Schack from Gillespie state that Schack will automatically get the medical records position. Id. (emphasis on page 204: "Q: There is nothing in here that tells you that you are going to get the job, right?  A: Right."   Gillespie said only that she would "reach out" to the Director in charge of that department (JA 415).

On November 13, 2018, after Schack applied for the medical records position, recruiter Erica Strickland emailed Schack about the position and stated: "Thank you for your interest in the HIM Clerk position with Parallon.  I see that you have been in your current position less than 6 months so I will need to contact your manager to

8

confirm she approves of you transferring to another role.  Please confirm you are fine with me contacting your manager to verify approval." (JA 104-107, 202-203, 651-661). Schack never responded to Ms. Strickland (JA 90, 104-107, 202-203, 651-661).

Ms. Strickland was the recruiter who handled the requisition for the HIM Clerk position (medical records position) for which Schack applied on November 10, 2018.  Id.  Parallon has a policy whereby if an employee applies for another position, he/she must be employed at least six months in the original position or have the approval of his/her manager to obtain another position within the company. Id. Schack had not been employed in the part-time registrar position for at least six months, therefore, Ms. Strickland sent Schack the email. Id.  Schack failed to respond to Ms. Strickland so Ms. Strickland rejected Schack as a further candidate for the medical records position.  Id.  As a result, the system sent Schack a letter dated November 16, 2018 thanking Schack for submitting an application for the position and stating that other candidates were being pursued for the position (JA 209-210, 616, 666-667).

Schack admits receiving the rejection letter from human resources and she did not contact anyone to follow-up regarding why she was rejected (JA 209-210). Employees are not just moved into positions in other departments, each person must submit an application, they must be eligible to transfer into the other position (with

management approval if employed in a position less than six months), be interviewed and potential wages for the position must be confirmed (JA 390-391, 415-417).

Schack submitted a resignation email to Ms. Caldwell on November 12, 2018 stating she enjoyed her position as a registrar in the patient access department and that her resignation was effective November 13, 2018 (JA 208-209). Schack admits in her own handwritten notes that she called out of work 27 out of the approximate 37 days she was scheduled to work as a registrar (this does not include four weeks of training when she was not scheduled to work as an actual registrar) (JA 211-212).

Schack admits providing no medical documentation to Parallon verifying she had a medical diagnosis of Hyperemesis Gravidarum and she did not request any specific accommodations related to this condition except the two-weeks off which her doctor approved (JA 224). Schack admits her doctor never agreed to request that her hours be reduced as an accommodation (JA 238). Parallon's Reasonable Accommodation Policy states Parallon can request medical provider support for a reasonable accommodation (JA 299).

## DISTRICT COURT'S OPINION

The District Court granted summary judgment on Schack's breach of contract and fraudulent inducement claims (JA 752). It did so because it found that the undisputed facts failed to demonstrate the existence of an enforceable contract with

Parallon or any fraud related thereto because no evidence existed resembling an offer and acceptance of the kind that would create a legally binding contract. (JA 752-755). Specifically, it relied on Virginia contract law and Schack's deposition testimony which stated at most that Schack got the impression from Gillespie that she would get the clerk position and that it would be a lateral move, thus no offer was ever made (Id). Next, the District Court found that based on the fact that no contract existed, this undermined Schack's ADA and PDA discrimination claims because the breach of contract was the only adverse employment action Schack alleged (JA 752-756). In addition, the District Court held that even by putting the adverse employment action element aside, Schack still could not prevail because she could not show she was a qualified individual, another essential element of Schack's ADA and PDA claims (JA 752, 757-759). Schack could not show she was qualified because she could not meet the attendance requirements of her job which was an essential job function (JA 757-759). The undisputed facts showed that Schack missed at a minimum 20% of her scheduled shifts and as much as 70% of her scheduled shifts based on her own deposition testimony (JA 757-758) that she missed 27 out of 37 scheduled days and the record showed that Parallon could have terminated Schack based on her regular absences under Parallon's attendance policy (Id.). Importantly, the District Court ruled that no matter the accommodation provided to Schack, she would have been unable to do her job because she could not

11

be present for her job (Id.).  The Court also specifically found that Schack's court filings made no argument on this point and that Schack completely ignored the law and Parallon's arguments on the qualified individual issue (JA 758).  Thus, summary judgment was granted on Shack's ADA and PDA discrimination claims (JA 758-759).

Next, the District Court held that Schack could not prove her ADA failure to accommodate claim because she could not perform the essential functions of the job with reasonable accommodation as stated under the ADA and PDA discrimination claims (JA 759). The District Court further found that even if Shack could show that an accommodation would have allowed her to perform the essential functions of her job, Parallon's procedures of requiring a physician's statement supporting the reasonable accommodation request is appropriate under the law and Schack did not provide such a statement when Parallon asked her to do so (JA 759-760). The District Court also relied on Schack's testimony that Schack's doctor "wouldn't give" Schack a note to support her ADA request (JA 760). Thus, the District Court granted summary judgment on Schack's ADA failure to accommodate claim because she could not prove two of the elements of her claim (JA 759-761).

## IV.    SUMMARY OF THE ARGUMENT

The District Court properly granted summary judgment on all five of Shack's claims. Plaintiff was hired to work approximately 25-30 hours per week but she

failed to come to work even 15 hours per week on a regular basis and she repeatedly failed to follow Parallon's call-out policy (no text messaging and provide doctor's notes for absences). Schack's position in this matter is nothing more than a smear campaign against Regional Director Gillespie who only sought to properly seek the advice of human resources on how to manage an employee who repeatedly failed to come in to work, who repeatedly failed to provide doctors' notes like any other employee is required to do and, who repeatedly failed to follow the company's policies and procedures regarding call-outs and leaves of absences. Indeed, Schack often recites misleading passages that are taken out of context in an attempt to create a negative picture of Parallon's good faith efforts to partner with human resources and to provide Schack with assistance, to follow its policies and procedures and the law. Also, Schack's evidence that she texted her manager calling out for the day does not excuse the absence without a doctor's note and texting is not how employees call out of work because managers often do not get these messages on timely basis because they are with patients. Thus, Schack's focus on the fact that Schack texted her managers is unpersuasive.

Shack's breach of contract and fraudulent inducement claims were correctly dismissed based on the undisputed facts showing that no enforceable contract existed because no offer with specific terms and no acceptance of any certain terms existed in the record. The District Court appropriately analyzed Schack's deposition

testimony regarding the alleged contract and properly found that at most Schack's testimony proved only that Gillespie gave Shack the impression she would get the medical records clerk job and that it would be a lateral move but Gillespie did not say Shack would actually get the job and there were no statements in the record from Gillespie that promised Shack the medical records position if she resigned from her registrar position and there were no statements offering Schack the position at all (JA 747-750, 752-755). Thus, Schack failed to prove sufficient evidence of an offer or an acceptance to form an enforceable contract and this necessarily meant there could be no fraudulent inducement because this is limited to the formation of or the performance of the contract. Id. See Ware v. Scott, 257 S.E.2d 855, 857 (Va. 1979). Shack's Opening Brief does nothing to change this analysis or finding under a basic interpretation of Virginia contract law and it should be affirmed.

Schack's discrimination claims under the ADA and PDA properly failed as a matter of law because both claims required that Schack prove an adverse action was taken against her and she failed to do so. This is because the only adverse action she alleged was the breach of contract/fraudulent inducement claims which in effect constituted constructive discharge and, the District Court correctly found that no contract or fraud existed. Therefore, no adverse action was taken against Shack and, this was fatal to Shack's prima facie ADA and PDA discrimination claims. Schack submits evidence that sets forth how Gillespie knew what kind of condition Schack

suffered from and that Gillespie showed frustration about Schack failure to follow Parallon's call-out policy but this evidence is irrelevant to the dispositive issues in the case.

Furthermore, Shack's ADA and PDA discrimination claims failed as a matter of law because Shack could not prove an additional element of her prima facie cases which was that she was a qualified individual. Here, the District Court, again, properly considered the applicable law that Shack must be able to meet the attendance requirements of her job with or without accommodation and she proffered no evidence in the record that she could do so. Schack even admitted missing 27 out of 37 scheduled shifts as a registrar after her four weeks of training (JA 211-212). The law is clear that such unreliable and excessive absenteeism made Shack an unqualified individual.  Schack, therefore could not satisfy two elements of her prima facie cases and her ADA and PDA discrimination claims were dismissed and these holdings should be affirmed. Notably, Schack failed to address this argument in the District Court and she should not now be permitted to do so.

Schack's final claim of failure to accommodate under the ADA similarly failed because she could not prove two elements of her prima facie case. Shack's only two possible requested accommodations were two-weeks off per Schack's doctor's note dated September 28, 2018 and Schack's request to shorten her shifts after she returned from her two-week leave.   Per Parallon's Reasonable

15

Accommodation Policy, Schack was told she needed a doctor's note to support her request for shortened-shifts but Schack failed to submit a doctor's note and she stated that her doctor refused to give her such a note (JA 238, 299). The District Court correctly held that the law and Parallon's written policy provide that requiring medical provider support for reasonable accommodations is permissible and Schack's failure to provide same is fatal to her failure to accommodate claim (JA 759-761). Importantly, the District Court also rightly stated that no reasonable accommodation existed to overcome Schack's inability to attend work. (JA 757-758 citing Waggoner v. Olin Corp., 169 F.3d 481, 484 (7th Cir. 1999)). Thus, Schack's failure to accommodate claim failed for this reason as well. Because the District Court did not err in making these findings and rulings, summary judgment should be affirmed on all of Schack's claims.

## V.    ARGUMENT

### 1.    Standard of review.

An appellate court will review the district court's grant of summary judgment de novo. Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc., 673 F.3d 294, 299 (4th Cir. 2012). An appellate court will also apply the same standard as the trial court in reviewing a summary judgment decision. Goodman v. Diggs, 986 F.3d 493, 497 (4th Cir. 2021). A federal court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions

16

on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986).  A party moving for summary judgment bears the initial burden of proving that no genuine issue of material fact exists in the case.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the party moving for summary judgment satisfies this burden, the non-moving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial.  Id. at 322-24.

A material fact is one could alter the outcome of the case under the applicable law.  Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001). A disputed fact constitutes "a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  Id.  Such facts must be presented in the form of exhibits and sworn affidavits.  Bragg v. Orthopedic Associates of Virginia, No. 2:06-cv-347, 2007 U.S. Dist. LEXIS 14836, *6-8 (E.D. Va. Mar. 2, 2007) (unpublished opinion) (granting summary judgment and citing Celotex, 477 U.S. 317).  "[T]he plain language of Rule 56 mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at *7-8 (quoting Celotex, 477 U.S. at 322).

Although a court will view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than show merely some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Hence, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; . . . evidence [must exist] on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Importantly, "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial. If the opposing does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

In an employment discrimination case, summary judgment is appropriate when the plaintiff is unable to prevail as a matter of law. Evans v. Technologies Applications & Service Co., 80 F.3d 954, 958-59 (4th Cir. 1996). A non-moving party's self-serving, conclusory affidavit is insufficient to survive a motion for summary judgment. See id. (holding that a Title VII plaintiff's conclusory affidavit regarding her qualifications and her colleagues' deficiencies was insufficient to overcome summary judgment); Jeandron v. Bd. Of Regents of the University System

of Md., 510 Fed. Appx. 223, 228 (4th Cir. 2013) (holding, in an ADA case, that a self-serving affidavit, without any other evidence, is insufficient to overcome summary judgment); Malghan v. Evans, 118 Fed. Appx. 731, 733 (4th Cir. 2004) (holding that a Title VII plaintiff's conclusory and self-serving affidavit was insufficient to overcome summary judgment where there was evidence of legitimate, non-discriminatory reasons for the adverse action); Bryant v. Yorktowne Cabinetry, Inc., 548 F. Supp. 2d 239, 246-47 (W.D. Va. 2008) (same); Diamond v. Bea Maurer, Inc., 128 Fed. Appx. 968, 973 (4th Cir. 2005) (same).

### 2. The District Court did not err in finding that no contract or fraudulent inducement existed in this matter.

Schack's Opening Brief assumes that Schack and Gillespie agreed on the medical records position as a position into which Schack would be placed and that Gillespie breached the promise to actually place Schack into this position. However, Schack ignores the first step in the analysis required to establish that a contract was breached: that a contract was formed. Importantly, vagueness can prevent the formation of a binding contract. Albanese v. WCI Communities, Inc., and WCI Mid-Atlantic U.S. Region, Inc., 530 F. Supp. 3d 752, 763 (E.D. Va. 2007). "An offer is a manifestation of a willingness to enter into a bargain' and 'identifies the bargained for exchange." Chang v. First Colonial Sav. Bank, 410 S.E.2d 928, 930 (Va. 1991). "An enforceable contract must contain terms that are 'sufficiently definite to enable a court to give it an exact meaning.'" Id. (quoting Smith v. Farrell, 199 Va. 121; 98

S.E.2d 3, 7 (1957)). "Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms.  If any portion of the proposed terms is not settled, or no mode is agreed on by which it may be settled, there is no agreement." Id.

Schack failed to prove that a contract was formed that could be breached and her Opening Brief does nothing to overcome this obstacle. Specifically, Schack admits that Gillespie did not explicitly tell her that Schack would get the medical records position and no text messages to Schack from Gillespie state that Schack will automatically get the medical records position (JA 191-194, 203-204, 374) (emphasis on page 204: "Q: There is nothing in here that tells you that you are going to get the job, right?  A: Right."  Gillespie said only that she would "reach out" to the Director in charge of that department (JA 415).

Schack's reliance on the Sea-Land Service, Inc. v. O'Neal, 297 S.E.2d 647 (1982) is misplaced because it is clearly distinguishable.  In Sea-Land, all the managers who would need to be involved in the position transfer including her current manager and her future new manager in the new department actually approved O'Neal's transfer, they admitted they told O'Neal that if she resigned her current position, she would get the teletype/messenger position and O'Neal's resignation letter stated she was resigning her current position and accepting the teletype/message position.  Id. at 649. None of this same evidence exists in Schack's

case. In fact just the opposite exists in Schack's case because Schack admits that she never responded to the recruiter's inquiry into having her current manager approve the transfer (JA 90, 104-107, 202-203, 651-661) and, the undisputed evidence proves Gillespie had no authority to hire or fire anyone in the medical records department (JA 191-194, 203-302, 374) and, Schack admits she knew that the medical records position was in another department over which Gillespie had no authority. Id. This alone means that Gillespie could not bind Parallon regarding allegedly promising Schack a position in another manager's department. Moreover, Debbie Sinclair, Director of Medical Records, was the decision-maker regarding the medical records position (JA 590, 597) and she knew nothing about Schack's interest and application in the medical records position (JA 600-602). Furthermore, in Sea-Land, O'Neal's managers announced in a meeting that O'Neal was transferring from one job to another. Sea-Land, 297 S.E.2d 647, 649 (1982). This did not happen in Schack's case. Sea-Land is not on point and it does not govern this matter for the above reasons. The District Court agreed (JA 755).

Importantly, other than Gillespie's alleged promise to help Schack get the medical records position, Schack has proffered no evidence of the essential terms of this alleged contract including whether Schack was actually qualified to perform the job because it requires someone working 40 hours a week, a start date, pay, training, scheduling or any other term associated with the medical records position. No

21

contract can exist without these basic, materials elements being agreed upon. "In order to be binding, an agreement must be definite and certain as to its terms and requirements; it must identify the subject matter and spell out the essential commitments and agreements with respect thereto." Dodge v. Trustees of Randolph-Macon Woman's College, 276 Va. 1, 3-4, 661 S.E.2d 801, 803-04 (2008) (citing Progressive Constr. Co. v. Thumm, 209 Va. 24, 30-31, 161 S.E.2d 687, 691 (1968)). "The terms of the contract must be clear, definite and explicit." Id. (citing Judicial Inquiry and Review Commission of Va. v. Elliott, 272 Va. 388, 391, 410 S.E.2d 928, 930 (1991). "A contract must be sufficiently 'definite to enable a court to give the contract an exact meaning, and the contract must obligate the contracting parties to matters that are definitely ascertained or ascertainable.'" Dodge, 276 Va. 1, 3-4, 661 S.E.2d 801, 803-04 (citing Smith v. Farrell, 199 Va. 121, 128, 98 S.E.2d 3, 7 (1957)). The District Court did not err in finding no contract existed.

Next, Schack claims that Gillespie engaged in misrepresentation and/or deception and that Gillespie offered Schack a transfer fraudulently. First, this claim fails because fraudulent inducement is limited to formation or performance of a contract and based on the fact no offer was made, no fraud can exist. See Ware v. Scott, 257 S.E.2d 855, 857 (Va. 1979). However, to complete the analysis, Parallon assumes that Schack's misrepresentation/deception argument is part of Schack's fraud in the inducement claim. In order to prove this claim, Shack had to prove a

misrepresentation or concealment was intended to, and in fact did induce the formation of a contract. Ware v. Scott, 220 Va. 317, 257 S.E.2d 855, 857 (1979); Albanese, 530 F. Supp. 2d at 770. Significantly, the fraud cannot be predicated on unfulfilled promises or statements of future events. Albanese, F. Supp. 2d at 770. "A promise to perform an act in the future is not, in a legal sense, a representation as that term is used in the fraud context." Id. (quoting Lissmann v. Hartford Fire Ins. Co., 848 F.2d 50, 53 (4th Cir. 1998)(citing Colonial Ford Truck Sales v. Schneider, 228 Va. 671, 325 S.E.2d 91, 94 (1985)). Schack failed to do this because at most what is asserted is nothing more than Gillespie's promise to do an act in the future – i.e., to place Schack in the medical records position at some point in the future. Though it is disputed that Gillespie ever made this promise and it is disputed that Gillespie told Schack to resign, the evidence, including Schack's deposition testimony fail to prove fraud in the inducement (JA 191-194, 203-204, 374, 415, 752-755). The District Court correctly found that communications between Schack and Gillespie regarding the medical records position did not constitute a contract and there was no fraud. Id. At most, this was simply a discussion about Schack's attempt to get such a position with Gillespie's help (JA 755). Gillespie did not engage in any fraudulent or deceptive behavior at all, and there is no indication of the same in the record.

Moreover, none of this claimed behavior on the part of Gillespie rises to the level of misrepresentation resulting in constructive discharge. The two cases cited in the Stone decision provide examples of such qualifying deceptions, including failing to explain the consequences of the resignation (such as its effect on accumulated sick leave) or an alternative to resignation. Those examples contemplate a situation where any employer says to an employee if you resign, your accumulated paid time off will be compensable, but then upon resignation, the employee's paid time off is waived, and not compensable. That would be a situation where it would be a misrepresentation for constructive discharge purposes. Alternatively, if a supervisor failed to explain the alternatives for resignation as set forth by some policy of the employer, then an employee's resignation may be involuntary. None of those sorts of things happened here. Rather, at most, Schack was informed of a potential other position, and she failed to get that job. This situation simply does not rise to the level of "misrepresentation" or "deception" to amount to a constructive discharge under applicable law.

Even the case cited by Schack results in a finding that the employer did not constructively discharge that employee, providing, in part:

> In this case, there is no evidence of misrepresentation or deception or that defendant sought to take advantage of plaintiff's frail mental state in order to force his resignation. Under the law of constructive discharge, the plaintiff must be able to identify conduct on the part of the employer intended to cause the plaintiff's resignation. The evidence establishes a high pressure environment and a defendant who knew that

plaintiff was overworked and experiencing stress. Plaintiff does not put forth any evidence to suggest that defendant intentionally created that environment for the purposes of inducing plaintiff's resignation so as to deprive him of FMLA leave.

King v. Blanchard Mach. Co., No. CA 3:10-3219-MBS, 2012 WL 4586177, at *7 (D.S.C. Sept. 28, 2012).  Despite Schack's claim that Gillespie promised her this job, as the District Court pointed out, Schack's deposition "tells a much milder story" (JA 749).  Schack admits that this position was in another manager's department (JA 191).  Schack also admits that Gillespie informed her that another hiring manager was in charge of that position (JA 191-92).  Schack also had the unreasonable belief that she would not need to interview with this manager in charge of this new position.  (JA 192).  Moreover, Schack admitted that Gillespie stated that she would "let the manager in the other department know and we'll go from there" (JA 193).  Schack also admitted that she never read a company policy about making a lateral transfer. (JA 195).  And, importantly, employees are not just moved into positions in other departments without going through the normal process of submitting an application, being eligible to transfer into the other position (i.e., getting approval from manager if employed in current position less than six months), being interviewed by the new proposed manager and potential wages being confirmed (JA 390-391). Schack only submitted an application and she did nothing else (JA 191-194, 203-203, 374).  Thus, Gillespie only offered to help.  She never agreed to take any specific actions by a time certain.  She never guaranteed any

outcome or that Schack would actually get the job, especially because doing so would be against the protocol described above (JA 191-194, 203-203 374, 390-391). There was simply no misrepresentation on the part of Gillespie. The district court correctly rejected these claims.

### 3. The District Court did not err in finding no adverse action existed to support Schack's ADA and PDA discrimination claims.

Schack claims that the Gillespie's misrepresentation and/or deception constitutes constructive discharge, such that it amounts to an involuntary resignation. Parallon assumes that Schack is applying this argument to the fraudulent inducement claim as well as to the ADA and PDA discrimination claims. Parallon incorporates in full this same argument explained in detailed in Section II above. In addition, if Schack interpreted Gillespie's communications as a "guarantee" of a job, then such interpretation was not reasonable under the circumstances. Under Schack's own claimed applicable legal principles, an employee claiming constructive discharge under a theory of misrepresentation must have reasonably relied on any purported misrepresentation. Schack did not reasonably rely on any comment by Gillespie, and, accordingly, her claim of constructive discharge is insufficient as a matter of law.

To the extent Schack is arguing that a more standard constructive discharge situation applies, this fails as well. "The constructive discharge doctrine contemplates a situation in which an employer discriminates against an employee to

the point such that the working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign. Green v. Brennan, 136, S. Ct. 1769, 1777 (2016). This showing is higher than what is required for a hostile work environment claim. Gill v. TBG Food Acquisition Corp., 2020 WL 3869569, Civil Action No. 7:19-cv-00479, *8 (W.D. Va. July 9, 2020) (citing Evans v. Int'l Paper Co., 936 F.3d 183, 193 (4th Cir. 2019)). "The demanding standard is not met by allegations suggesting that a reasonable person would have viewed resignation as the wisest or best decision." Id. Instead, the plaintiff must prove that she had no choice but to resign. Id. (citations omitted). "Unless conditions are beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress." Id. (citations omitted). "[D]ifficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign." Evans, 936 F.3d at 193; Gill, 2020 WL 3869569 at *9. Schack can prove not set of facts to establish this high standard. The undisputed facts demonstrate that Parallon did everything it could to work with Schack during her employment and after she announced she was pregnant. Schack asserts she was scheduled to work late more after she announced she was pregnant and after she took her two-week leave, but the schedules and Schack's deposition testimony prove otherwise (JA 88-90, 145-153, 226-230) The schedules show that she was scheduled to work late more before she announced she was pregnant than after she announced

same.  Id.  In addition, Schack admits that she could have been written-up more and terminated for all of her unexcused absences but she was not (JA 42-44, 91, 97, 153-155, 164-167).  She admits that Ms. Caldwell encouraged her to speak with human resources, Ms. Spencer-Bennett in particular, to get assistance regarding time off and any other potential accommodations (JA 156, 479).  Schack also admits that Ms. Spencer-Bennett assisted her and provided her with information on how to request an accommodation and medical leave (JA 92-95, 157-158).  Ms. Spencer-Bennett excused many of Plaintiff's unexcused absences and gave her extra time to return medical documentation supporting a leave of absence and/or any other accommodations despite the fact Plaintiff did not return her medical documentation by the deadline (JA 42-44, 91-97, 153-158, 164-167).  Generally, Parallon attempted to shorten shifts when it could (JA 110).

Next, despite the fact that Parallon could have terminated Plaintiff, it only issued to her a written warning (JA 101-102, 176-181).  This warning was not a final written warning and it informed her that she had additional unexcused absences after she had returned to work from leave on October 16, 2018 with no medical restrictions or requests for accommodations from her doctor; that for many of these absences Plaintiff failed to utilize the appropriate call-out methodology; that she had not completed her required on-line training for the job, and that she was below productivity standards.  Id. This written warning is not an adverse action because it

had no collateral consequences.  See Jones v. Constellation Energy Projects & Servs., Grp., Inc., 629 Fed. Appx. 466, 468 (4th Cir. 2015).  Importantly, Plaintiff admits that her termination was never discussed, no one ever made negative comments to her about her pregnancy, no one said her pregnancy was a problem, and no one had any ill-will against her (JA 236-237).  Schack also never complained about pregnancy or disability discrimination despite knowing about Parallon's anti-harassment policy and procedures (JA 140-141, 220).  Finally, Plaintiff submitted a resignation stating she enjoyed her position as a registrar and she told her next employer she left to make more money (JA 208-209, 222). These undisputed facts dictate against a finding of constructive discharge and they prove that no other adverse action ever was taken against Schack. Thus, the District Court did not err in finding no adverse action.

4.      **Schack never raised the issue of being a "qualified individual" at the trial court below, and she should be precluded from raising such issue for the first time on appeal.**

When a litigant in a civil lawsuit fails to assert an argument in the district court and raises it for the first time on appeal, the appellate court may reverse the lower court's decision only if the new argument demonstrates a "fundamental error" or a deprivation of fundamental justice.  In re Under Seal, 749 F.3d 276, 285 (4th Cir. 2014).  "Fundamental error" is narrower than "plain error".  Id. at 285-86.  If a party

has not shown plain error, then the party has not shown fundamental error. Id. at 286.

The policy reasons for such a rule are to avoid prejudicial surprise to the adverse party, to seek finality in lawsuits, and to preserve judicial resources. Holly Hill Farm Corp. v. United States, 447 F.3d 258, 267 (4th Cir. 2006) (quotations omitted). Additionally, there is a need to develop evidence on the issues at the trial court level, and not at the appellate court level. In re Under Seal, 749 F.3d at 286 (citing In re Diet Drugs Prod. Liab. Litig., 706 F.3d 217, 226 (3d Cir. 2013)). Additionally, there is an interest in preventing parties from obtaining two bites at the proverbial apple by raising different arguments. In re Under Seal, 749 F.3d at 286 (citing Fleischman v. Cont'l Cas. Co., 698 F.3d 598, 608 (7th Cir. 2012)). This Court has also previously noted that it will not consider issues asserted for the first time on an appeal, in the absence of exceptional circumstances. Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 603 (4th Cir. 2004). The Supreme Court of the United States has also stated that "Due regard for the trial court's processes and time investment is also a consideration appellate courts should not overlook." Wood v. Milyard, 566 U.S. 463, 473, 132 S. Ct. 1826, 1834, 182 L. Ed. 2d 733 (2012).

Moreover, plaintiffs cannot "constructively" amend their complaints by raising new legal theories outside of the process of formally amending the complaint.

In <u>Harris v. Reston Hosp. Center, LLC</u>, the employee plaintiff tried to assert a new theory of wrongful termination due to having a record of "impairment" at the summary judgment stage (raising such argument for the first time in plaintiff's opposition to defendant's summary judgment motion). 523 F. App'x 938, 946 (4th Cir. 2013). The Court in that decision affirmed the trial court's rejection of plaintiff employee's attempt to "constructively" amend the complaint, and noted that "[b]ecause a complaint 'guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations,' constructive amendment of the complaint at summary judgment undermines the complaint's purpose and can thus unfairly prejudice the defendant." <u>Id.</u> at 946. The Court also noted that no "record of impairment" claim existed in her EEOC charge either. <u>Id.</u> On account of the employee's chronic absenteeism, the Court affirmed the trial court's ruling that the employee was not a "qualified individual" for purposes of ADA. <u>Id.</u> at 947.

Schack did not raise any argument against Parallon's claim that she was not a qualified employee at the District Court level. Pursuant to the foregoing principles, she cannot now raise those arguments for the first time on appeal. Tellingly, the District Court noted expressly in its Memorandum Opinion that "Schack's filings in this court make no argument on this point, entirely ignoring both the law and Parallon's arguments on the qualified-individual issue[.] Ultimately, Schack's

31

absenteeism prevents her from bringing an ADA claim because she is not a 'qualified individual'" (JA 758).

Despite this, Schack asserts that one of the two issues in this appeal is that "the district court erred when it dismissed each of Schack's ADA and PDA claims, finding, erroneously, that, as a matter of law, Schack was not 'qualified' for her position that she was not terminated from." Schack's Opening Brief, p. 2 (emphasis in original). Schack's Opening Brief goes on to argue this point, that Schack was a qualified individual. Id. pp. 26, 28.

To muddy the water, Schack argues that Parallon's counsel at oral argument at the summary judgment stage admitted that Schack "could perform her duties." Brief, p. 28. This meant that Schack was trained on how to perform her duties and she knew how to do it. The problem was Shack rarely showed-up for work to actually perform her job. In addition, the context of Parallon's counsel's comment was as to the issue of whether Schack was "disabled" for purposes of the ADA, specifically, whether Parallon regarded her as having a disability, it did not. (JA 694-695). This comment, taken out of context, had nothing to do with whether she was a "qualified individual" regarding her absenteeism. For these reasons, the Court should disregard Schack's argument on that issue.

In the transcript of the summary judgment hearing, counsel for Schack mentioned briefly that the recruiter "testified clearly that Schack was qualified for

32

the position or she never would have sent the emails to her at issue." (JA 727). Again, Shack's basic ability to learn and do the job is not the issue. The issue was her actually showing-up to work. This is a mischaracterization of what was meant by qualified. In addition, Schack cannot rely on this comment, as the burden was on Schack to raise this argument in her Complaint or in some filing with the District Court. Additionally, the record indicates that at the summary judgment hearing, the Court asked Schack's counsel specifically "Where my concern is and my focus today is whether Schack was a qualified individual given what her attendance record was; whether with or without the reasonable accommodation she could have performed the essential functions of that job." (JA 727). Even in a light most favorable to Schack, it is clear that she did not raise the issue of being a qualified individual at the District Court level either in her pleadings or in her arguments.

5.    **The District Court correctly found that Schack is not a qualified individual who could perform the essential duties of her job with or without reasonable accommodation.**

The ADA defines a qualified individual as "an individual who, with or without reasonable accommodation, *can perform the essential functions of the employment position* that such individual holds or desires." 42 U.S.C.A. § 12111 (emphasis added). Simply put, the ADA requires that an employee meet her job requirements in spite of her disability. Tyndall v. Nat'l Educ. Centers, Inc. of California, 31 F.3d 209, 213 (4th Cir. 1994) (quoting Southeastern Community College v. Davis, 442

33

U.S. 397, 406 (1979)). If a plaintiff cannot perform the essential functions of her job with reasonable accommodations, she cannot recover under the ADA. Lamb v. Qualex, Inc., 33 Fed. Appx. 49, 56 (4th Cir. 2002). It is the Plaintiff's burden to prove she can perform the essential functions of her job with or without reasonable accommodations. Tyndall, 31 F.3d at 213.

Further, regular and reliable attendance is an essential function of one's job. Lamb, 33 Fed. Appx. at 56 (citations omitted). "An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified individual protected by the ADA.'" Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209, 213 (4th Cir. 1994); Lamb, 28 F. Supp. 2d at 57. Indeed, attending one's job is the paradigmatic example of an essential job function. Tyndall, 31 F.3d 213, Walders v. Garrett, 765 F. Supp. 303 313 (E.D. Va. 1991). An individual who attends her job less than 70% of the time is not performing the essential functions of that job. See Posante v. Lifepoint Hosps., Inc., No. 4:10-cv-00055, 2011 WL 3679108, *5 (W.D. Va. Aug. 23, 2011). Courts have held that it is fair to conclude that in most instances the ADA does not protect persons who have erratic, unexcused absences, even when those absences are a result of a disability. See Waggoner v. Olin Corp., 169 F.3d 481, 484 (7th Cir. 1999)).

As the District Court correctly found, Schack is not qualified because she could not perform all of the essential functions of her job, even with reasonable

accommodation. This is because she could not meet the attendance requirements of the position and when she did work, she worked far below the expectations of the job. Schack was hired as a part-time registrar which required working 25-30 hours per week (JA 130-132, 446). She signed her offer letter and agreed to abide by all of Parallon's policies and procedures, including the attendance policy (JA 40-41, 133). Schack admits she reviewed and signed Parallon's attendance policy which states that during the first 90-day probationary period, if she had three occurrences (unexcused absences), she could be terminated (JA 42-44, 135-138). Further, in order to properly call-out of work, the policy states that Plaintiff had to contact one of her managers by phone and talk to someone or leave a voicemail message. Id. Email is not acceptable and failure to follow the policy would subject Schack to disciplinary action (JA 45, 48, 138-142). Schack also admits she received and understood Parallon's Corrective Action policy and she was expected to perform satisfactorily or she could be disciplined. Id.

Next, Plaintiff admits she called out of work (without a doctor's note) within the first two-weeks of starting her job for which she received a verbal warning (JA 153). She admits being warned that a second occurrence would result in a written warning and a third occurrence within the first 90 days could result in termination and, that texting was not a proper form of communication (JA 42-44, 154-155). This occurred before Schack announced she was pregnant (JA 155). Thereafter, Schack

admits missing 27 out of the approximate 37 days she was scheduled to work as a registrar (JA 211-212). Additionally, Schack testified she knew that Parallon could have terminated her for all of her unexcused absences, but it did not do so (JA 97, 164-167). Furthermore, even though Parallon accommodated her by granting her the two weeks off, by shortening some of her shifts, by excusing many unexcused absences, by providing her with all the information and paperwork needed to go out on a general medical leave and by not terminating her, Schack still could not perform her job (JA 92-97, 101-102, 157-158, 160-167, 176-181). Significantly, in attempting to accommodate Plaintiff, Gillespie offered to try and move Plaintiff into another position in the Patient Access Department managed by Gillespie which was a PRN position and did not require Plaintiff to work a set number of hours each week (JA 182, 295-296, 351, 362-363, 374). Plaintiff declined. Id.

Finally, the few times Schack worked, she performed far below the job expectations because she failed to timely complete her required on-line training and she only registered six patients in a five-hour period (JA 101-102, 176-181, 189). The expectation is that Schack should have registered 40 patients within eight hours and she admits she was deficient in this area. Id. Thus, the District Court did not err in finding that Schack as not qualified to perform the essential functions of her job because she could not attend work on a regular basis and this Court should affirm this ruling.

36

### 6. Summary judgment against Shack's failure to accommodate claim was properly granted.

The District Court did not err in granting summary judgment on Shack's ADA failure to accommodate claim. Under the ADA, a covered employer must make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the accommodation would impose an undue hardship on employer. 42 U.S.C.A. § 12112. An employer is not required to provide the employee with the accommodation he requests or prefers. Reyazuddin v. Montgomery Cty., Md., 789 F.3d 407, 415 (4th Cir 2015). It is the Plaintiff's burden to identify an accommodation that would enable him to perform his essential job function(s). Wilburn v. City of Roanoke, 2015 WL 5089243, Civil Action No. 7:14-cv-00255, *3 (W.D. Va. Aug. 27, 2015); Brooks v. Micron Technology, Inc., 2010 WL 11695207, Civil Action No. 1:09-cv-679, *2 (E. D. Va. June 2, 2010); Lamb v. Qualex, Inc., 33 F. Appx. 49, 59 (4th Cir. 2002). Indeed, "[t]he EEOC guidelines place the burden of requesting an accommodation on the employee. Had Plaintiff needed additional accommodation, he had an affirmative duty to request it, which he did not. Consequently, Plaintiff cannot show that he was denied a reasonable accommodation." Brooks, 2010 WL 11695207, at *3 (quoting Hansberry v. Computer Engineering Sys. Group, 1998 WL 539945, No. 97-1890, *3 (E.D. Va.

37

July 29, 1998)).   Plaintiff also bears the burden of proving such accommodation is reasonable. Id.

Moreover, an employer is not required to reallocate essential functions of a qualified individual's job in order to provide a reasonable accommodation. Wells v. BAE Sys. Norfolk Ship Repair, 483 F. Supp. 2d 497, 506 (E.D. Va. 2007) aff'd, Wells v. Bae Sys. Norfolk Ship Repair, 250 F. Appx. 552 (4th Cir. 2007). An employer is also not required to shift a disabled person's essential job functions to another employee. Id. at 509.   It is well-established in the Fourth Circuit that an employer's duty to provide a reasonable accommodation does not require an employer to create a new job position for a disabled employee. Wells, 438 F. Supp. 2d at 510; Lamb v. Qualex, Inc., 28 F. Supp. 2d 374, 378 (E.D. Va. 1998) aff'd, 33 F. Appx. 49 (4th Cir. 2002). Ultimately, any accommodation that eliminates an essential job function is not reasonable. Griffin v. Prince William Health Sys., 2011 WL 1597508, 01:10-cv-359, *5 (E.D. Va. Apr. 26, 2011). "An employer's one-time, good faith offer of accommodations does not bind the employer to extend similar offers in the future." Perrin v. Fennell, 2011 WL 837008, 1:10-cv-810, *7 (E.D. Va. Mar. 2, 2011).

Here, the District Court properly held that Schack could not prove her prima facie case: because she could not perform the essential functions of her job with reasonable accommodation. First, the evidence proves that Parallon granted all

reasonable accommodations properly requested and more (JA 92-97, 155-158, 160-167, 182, 295-296, 351, 362-363, 374, 479). The only accommodation Schack's doctor made and supported was to provide Schack with a two-week leave from work which was granted (JA 96-97, 162-167). Second, Schack asked for shortened shifts but she testified that her doctor refused to provide a doctor's note supporting this request (JA 58-59, 169-170, 235-236, 255-256). Finally, Parallon has a Reasonable Accommodation Policy that is uniformly applied to all employees and the policy and law Parallon to request medical provider support for reasonable requests for accommodation in the workplace (JA 299, 568-569). <u>See also</u> the EEOC's interpretive guidance for the ADA clarifies that an employer may require that the employee provide documentation of their need for an accommodation – 29 C.F.R. § Pt. 1630, App. Failure to provide medical documentation precludes a failure to accommodate claim (JA 760 citing <u>Tchankpa v. Ascena Retail Grp., Inc.</u>, 951 F.3d 805, 812 (6th Cir. 2020); <u>Ward v. McDonald</u>, 762 F.3d 24, 32 (D.C. Cir. 2014)). Thus, the District Court did not err in granting summary judgment on this claim.

Notably, Parallon excused all of Schack's unexcused absences prior to the time Schack's doctor requested she take two weeks off despite the fact Parallon could have terminated her employment under the attendance policy which Schack admits (JA 97, 164-167 ). Gillespie also discussed moving Schack to another position within the Patient Access Department which Gillespie managed and had the

authority to do (JA 182, 295-296, 351, 362-363, 374). Gillespie had open PRN positions which means employees are scheduled as needed and this type of position would not require Plaintiff to work 25-30 hours per week as the non-PRN part-time registrar position required. Id. Plaintiff declined. Id.

Plaintiff's argument that she somehow should have been placed in a medical records position located in another department not within Gillespie's authority is not reasonable and was not warranted. Gillespie made the offer to move Plaintiff to another position within Gillespie's own department. Id. Additional offers are not required under the law. "An employer's one-time, good faith offer of accommodations does not bind the employer to extend similar offers in the future." Perrin v. Fennell, 1:10-cv-810, 2011 WL 837008, *7 (E.D. Va. Mar. 2, 2011). Schack could not attend work on a regular basis for a part- time position much less a full-time position which the medical records position required. Also, Shack never submitted medical documentation to support such a move (JA 224). Notwithstanding this, in response to Schack's application for this position, Parallon's recruiter reached out to Schack asking for approval to talk to Schack's manager to get permission for Schack to be considered for the medical records position and Schack never responded (JA 90, 104-107, 202-203, 651-661). Thus, Schack rejected the opportunity to be considered for the position. Id. The record in this matter is

40

saturated with evidence proving that the District Court did not err in granting summary judgment on Schack's failure to accommodate claim.

## VI.    CONCLUSION

The District Court properly considered each of Schack's claims and the admissible evidence in the record and the applicable law.  After doing so, the District Court properly granted summary judgment on all of Schack's claims. Accordingly, Parallon respectfully requests that this Court affirm the District Court's summary judgment rulings in their entirety.

## VII.    APPELLANT'S POSITION ON ORAL ARGUMENT

Parallon respectfully requests oral argument in this matter.

**Respectfully submitted,**

**Parallon Enterprises, LLC**

/s/ Susan Childers North
Susan Childers North, Esq.
Brett C. Herbert, Esq.
GORDON REES SCULLY MANSUKHANI, LLP
5425 Discovery Park Boulevard, Suite 200
Williamsburg, VA  23188
Telephone: (757) 903-0870
Facsimile: (757) 401-6770
Email:SNorth@grsm.com
          BHerbert@grsm.com

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.   This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments);

[ X ]   this brief contains [*10,008*] words

[      ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.   This brief complies with the typeface and type style requirements because:

[ X   ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*]; or

[      ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: July 27, 2021                    /s/ Susan Childers North
                                        *Counsel for Appellee*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 27th day of July, 2021, I caused this Brief of Appellee to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Susan Childers North
*Counsel for Appellee*