RECORD NO. 21-1201

In The
# United States Court of Appeals
### For The Fourth Circuit

## CLARA SCHACK,

*Plaintiff – Appellant,*

v.

## PARALLON ENTERPRISES, LLC,

*Defendant – Appellee,*

**and**

## LEWIS-GALE HOSPITAL, INCORPORATED; HCA - THE HEALTHCARE COMPANY; MONTGOMERY REGIONAL HOSPITAL, INC.,

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA AT ROANOKE**

_____

**REPLY BRIEF OF APPELLANT**

_____

**Brittany M. Haddox**
**Thomas E. Strelka**
**STRELKA EMPLOYMENT LAW**
**119 Norfolk Avenue, SW, Suite 330**
**Roanoke, Virginia 24011**
**(540) 283-0802**

*Counsel for Appellant*

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

ARGUMENT ...................................................................................................... 1

    1.    <u>Breach of Contract</u>.................................................................................. 1

        a.    A contract to exchange jobs is not vague: the essential terms are that one position is being exchanged for another........ 1

        b.    The district court did not address Regional Director Gillespie's authority to offer such a contract, instead deciding the breach of contract claim entirely on its mistaken belief that, as a matter of law, there was no contract formation based on the words used. In any event, as Parallon has raised the issue herein, Regional Director Gillespie, who reports directly to Parallon's CEO, had authority, actual or apparent, to bind Parallon in this regard. Moreover, the question of authority must be resolved by a jury ............................................................................................ 2

    2.    <u>Fraud in the Inducement:</u> Making an offer with a *present intent* not to perform, even if the offer is to perform a future act, constitutes fraud in the inducement...................................... 6

    3.    <u>ADA and PDA Discrimination</u> ............................................................ 7

        a.    <u>Adverse Act:</u> There is no reason to analyze traditional notions of "constructive discharge" — the law is clear, if the employee was denied the opportunity to make a free choice of resigning due to misrepresentation or deception, it is a "constructive discharge" .................................................. 7

        b.    <u>"Qualified"</u> ................................................................................ 12

            i.    Appellant argued before the district court that she was qualified................................................................. 13

      ii.    Ms. Schack did not miss too much work such that she was not a "qualified" individual. She was not even terminated, let alone terminated for missing work ...............................................................................14

      iii.   Parallon's statements on brief related to Ms. Schack's alleged refusal to move to a PRN status are not supported by the record ...........................................18

   4.    ADA and PDA Failure to Accommodate...........................................18

      i.    Parallon's statements on brief related to Ms. Schack's alleged refusal to move to a PRN status are not supported by the record. Moreover, what the record does establish is that even if a PRN position / status was offered, it would have been inferior to the HIM Clerk position, which was clearly offered as an accommodation..............................................................18

      ii.   Failure to offer a transfer to an open, available position for which Ms. Schack was qualified is an adequate basis to allege a failure to accommodate claim.................................................................19

      iii.   Before the transfer was offered, Parallon failed to accommodate Ms. Schack with shorter shifts. Moreover, Ms. Schack made the request for shorter shifts again on November 7, 2018. There was no request for medical records to support this second request before Ms. Schack was constructively discharged ...................................................................21

CONCLUSION ........................................................................24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bardach Iron and Steel Co., Inc. v. Charleston Port Terminals*,
    143 Va. 656, 129 S.E. 687 (1925) ....................................................6

*Barnett v. Revere Smelting & Ref. Corp.*,
    67 F. Supp. 2d 378 (S.D.N.Y. 1999) ...........................................13

*Covington v. Dep't of Health & Human Servs.*,
    750 F.2d 937 (Fed. Cir. 1984) ...................................................7, 8

*Crabill v. Charlotte Mecklenburg Bd. of Educ.*,
    423 F. App'x 314 (4th Cir. 2011) ................................................19

*EEOC v. Browning-Ferris, Inc.*,
    262 F. Supp. 2d 577 (D. Md. 2002) ....................................... 16-17

*EEOC v. Mfrs. & Traders Tr. Co.*,
    429 F. Supp. 3d 89 (D. Md. 2019) ..............................................23

*Estate of Allen v. Balt. Cty.*,
    Civil Action No. CCB-13-3075,
    2017 U.S. Dist. LEXIS 208949 (D. Md. Dec. 20, 2017) ..............8

*Fagan v. Palm Beach Cty. Sheriff's Office*,
    No. 19-80403-CIV,
    2019 U.S. Dist. LEXIS 147572 (S.D. Fla. Aug. 27, 2019) ...........8

*Jacobson v. Barnhart*,
    No. WMN-05-1381,
    2006 U.S. Dist. LEXIS 104525 (D. Md. Dec. 14, 2006) .............17

*Lloyd v. Smith*,
    150 Va. 132, 142 S.E. 363 (1928) ................................................7

*Merrill v. McCarthy*,
    184 F. Supp. 3d 221 (E.D.N.C. 2016) ............................................................12

*Moose v. Nationwide Mut. Ins. Co.*,
    No. 5:08CV77-RLV,
    2011 U.S. Dist. LEXIS 106117 (W.D.N.C. Sep. 19, 2011) ...........................6

*Neff Trailer Sales, Inc. v. Dellinger*,
    221 Va. 367, 269 S.E.2d 386 (1980) ..........................................................5, 6

*Parrinello v. Finn*,
    589 F.2d 100 (2d Cir. 1978) ............................................................................8

*Pettus v. Am. Safety Razor Co.*,
    2001 U.S. Dist. LEXIS 6968 (W.D. Va. Mar. 29, 2001) .............................16

*Scharf v. Dep't of Air Force*,
    710 F.2d 1572 (Fed. Cir. 1983) .......................................................................7

*Sea-Land Serv., Inc. v. O'Neal*,
    224 Va. 343, 297 S.E.2d 647 (1982) .......................................................1, 6, 7

*Stone v. Univ. of Md. Med. Sys. Corp.*,
    855 F.2d 167 (4th Cir. 1988) ..........................................................................7

*Teahan v. Metro-North Commuter R.R. Co.*,
    951 F.2d 511 (2d Cir. 1991) .........................................................................14

*Torres v. Hilton Int'l of P.R., Inc.*,
    2012 U.S. Dist. LEXIS 91436 (D.P.R. July 2, 2012) ...................................16

*Wright v. Shortridge*,
    194 Va. 346, 73 S.E.2d 360 (1952) ................................................................5

**REGULATION**

29 C.F.R. § 1630.2(m) ........................................................................................12

**OTHER AUTHORITY**

Restatement (Second) of Torts § 530 comment c (1977) .........................................7

# ARGUMENT

1. <u>**Breach of Contract**</u>:

    a. **A contract to exchange jobs is not vague: the essential terms are that one position is being exchanged for another.**

Parallon argues that "Schack has proffered no evidence of the essential terms of the alleged contract" (Appellee Br. at 21). *Sealand*, again, directly addresses this point. The specific terms of the new position are not discussed in the opinion, and instead, the Virginia Supreme Court held: "We fail to see, however, why a contract to exchange jobs should not be considered a contract of employment; indeed, we do not believe it can logically be considered otherwise." *Sea-Land Serv., Inc. v. O'Neal*, 224 Va. 343, 348, 297 S.E.2d 647, 650 (1982).

Moreover, in any event, the terms of the job were discussed as Regional Director Gillespie stated it was a lateral move (JA 193), where Ms. Schack "would not be running around the E.R. I wouldn't be – I would be seated in an office that was less demanding" (JA 189) (*see also* (JA 421) (Regional Director Gillespie indicating that Ms. Schack thought the HIM Clerk position "would be better suited for when she was available"; (JA 582) (Regional Director Gillespie informed Mr. Schack that "it would be a lateral move with the position being full time, Monday through Friday with the hours of 8AM to 5PM. This position would also come with benefits, and she felt it would be easier on [Ms. Schack] with her

pregnancy"; (JA 498) (Ms. Schack submitted the application that was required, meaning that she saw and reviewed the specifics of the job posting)).

> **b.     The district court did not address Regional Director Gillespie's authority to offer such a contract, instead deciding the breach of contract claim entirely on its mistaken belief that, as a matter of law, there was no contract formation based on the words used.  In any event, as Parallon has raised the issue herein, Regional Director Gillespie, who reports directly to Parallon's CEO, had authority, actual or apparent, to bind Parallon in this regard.  Moreover, the question of authority must be resolved by a jury.**

Regional Director Gillespie had authority, actual or apparent, to bind Parallon to exchange Ms. Schack's current position for another lateral position. On November 7, 2018, Ms. Schack reached out to HR Manager Spencer-Bennett, asking for the hospital administrator's number (JA 295).   HR Manager Spencer-Bennett gave Ms. Schack Regional Director Gillespie's number (*Id.*).  Ms. Schack, not knowing that Regional Director Gillespie had been in the loop on her situation up to that point (JA 184), relayed to Regional Director Gillespie everything that had occurred:

> I explained to her what has been going on. I explained my absences, why I was absent, my health condition I was diagnosed with during this to cause myself to miss so much work.  I explained everything going on as well as this Corrective Action, that I disagreed with the Corrective Action because I have proof of -- of the things that I disagreed with, and I explained to her I needed shorter work hours because I never knew when I was going to be sick, and she told me that she was sorry about all of this, that a text message was appropriate due to my illness, and the way that the illness impacted my everyday life as well as speaking on the phone, that she would get with Lisa and Suzanne and she would excuse my absences as well as create a plan, and she actually told me –

> she asked me if I needed some more time off, and she told me that she
> would let Lisa and Suzanne know I would not be there for my next shift.

(JA 182-183). Regional Director Gillespie assured Ms. Schack that she need not do

anything further with respect to her accommodation requests or missed days

(JA 190, Regional Director Gillespie "just said that it would all be taken care of per

her," that Regional Director Gillespie would be the one handling it from there

(JA 185)). Regional Director Gillespie then spoke with Mr. Schack, Ms. Schack's

father, stating that Regional Director Gillespie wanted Ms. Schack to apply for the

HIM Clerk position, which Regional Director Gillespie believed would be an easier

job on Ms. Schack while suffering from a pregnancy-related disability (JA 582;

JA 421; JA 189). Regional Director Gillespie informed Mr. Schack "that she knew

the head of the Medical Records Department, and she didn't anticipate a problem

getting Clara [Schack] moved" (JA 582). Ms. Schack then spoke with Regional

Director Gillespie who said that she, Regional Director Gillespie, "would do the

talking with the other manager to have a lateral move done" (JA 194). Later,

Regional Director Gillespie again contacted Ms. Schack to tell Ms. Schack to submit

a resignation "from [her current] job in order to move to [the] new job," (JA 194)

stating that Ms. Schack "*would* laterally move to that position" (JA 193). As

Ms. Schack stated, "She just instructed me of all this stuff, and I thought that I could

believe her and trust her. In my eyes, I was blind-sided. I knew that she was a high-

3

up and I thought that I could put all of my trust in her and everything would work

out, but no" (JA 192).  As Ms. Schack further testified:

> You know, I put all my trust and feelings to Jenn Gillespie, and I
> thought that she was leading me in a truthful, right path and she did not,
> and when I was instructed to do all of these things and **then it didn't
> happen the way that she said that it would happen**, I felt betrayed.

(Ex. 1, at 122) [Emphasis added].

> Q. Okay. Did you read any company policy about it; did you look
> anything up about how to make a lateral transfer?
> A. No, I had all my trust in her.

(JA 195).  Notably, reading a policy would not have mattered, as Regional Director

Gillespie admitted, it is "[a]bsolutely" true that going outside normal policy and

procedure, such as outside the normal transfer policy and procedure, to

accommodate an individual is part of the ADA (JA 390).

Ms. Schack's reliance was reasonable: Regional Director Gillespie reports

directly to the CEO (JA 321), HR sent Ms. Schack to Regional Director Gillespie to

handle Ms. Schack's need for accommodation (JA 295), Regional Director Gillespie

relayed to Mr. Schack that she saw no issues getting this accomplished (JA 582),

which was followed by Regional Director Gillespie informing Ms. Schack that she,

Regional Director Gillespie, would handle speaking with the hiring manager, and

after it appeared Regional Director Gillespie had spoken to the hiring manager, was

followed by Regional Director Gillespie informing Ms. Schack that she needed to

put in her resignation for her current job and Ms. Schack would be laterally transferred to the new position (JA 191-195; JA 498-500).

Regardless, as the Virginia Supreme Court stated in *Neff Trailer Sales, Inc. v. Dellinger*, 221 Va. 367, 370-71, 269 S.E.2d 386, 388 (1980), citing back to two of its prior opinions, the resolution of apparent agency, unless absolutely clear it does not exist, must be left to the jury to decide (thus, a decision on summary judgment is not appropriate):

> In *Wright* v. *Shortridge*, 194 Va. 346, 352-53, 73 S.E.2d 360, 364-65 (1952), we faced a comparable issue and there said:
>
>> The general rule is that as between the principal and agent and third persons, the mutual rights and liabilities are governed by the apparent scope of the agent's authority, which is that authority which the principal has held the agent out as possessing, or which he has permitted the agent to represent that he possesses, in which event the principal is estopped to deny that the agent possessed the authority which he exercised. In such cases the apparent authority, so far as third persons are concerned, is the real authority; and when the third person has ascertained the apparent authority with which the principal has clothed the agent, he has a right to rely thereon. (Citations omitted.)
>>
>> An act is within the apparent scope of an agent's authority if, in view of the character of his actual and known duties, an ordinarily prudent person, having a reasonable knowledge of the usages of the business in which the agent is engaged, would be justified in believing that he is authorized to perform the act in question. (Citations omitted.)
>>
>> . . . Whether or not Leonard was acting within the apparent scope of his authority as agent for defendant . . . was a question of fact

to be determined by the jury under proper instructions. (Citations omitted.)

In *Bardach Iron and Steel Co., Inc.* v. *Charleston Port Terminals*, 143 Va. 656, 672, 129 S.E. 687, 692 (1925), we said:

> Corporations can only act through agents, and when one acting as agent is not an outside party appointed for a special purpose, but is a permanent employee or officer of the company, the question as to the authority and power of such a representative *should be left to the jury*, unless the evidence shows that this authority on the occasion in question was necessarily limited. This is the tendency of the modern decisions. (Emphasis added.) (Citation omitted.)

*Neff Trailer Sales, Inc. v. Dellinger*, 221 Va. 367, 370-71, 269 S.E.2d 386, 388 (1980); *see also Moose v. Nationwide Mut. Ins. Co.*, No. 5:08CV77-RLV, 2011 U.S. Dist. LEXIS 106117, at *21 (W.D.N.C. Sep. 19, 2011) (even when company pointed to policy prohibiting the alleged contract at issue, the court denied summary judgment holding that apparent authority and reasonable reliance are jury questions).

**2.    <u>Fraud in the Inducement</u>: Making an offer with a *present intent* not to perform, even if the offer is to perform a future act, constitutes fraud in the inducement.**

Parallon continues to make the inaccurate argument that a promise to perform a future act cannot be the basis for a fraud in the inducement claim (Appellee Br. at 23). *Sealand* directly forecloses this argument. *Sealand* holds that "'an action in tort for deceit and fraud may sometimes be predicated on promises which are made with a present intention not to perform them... It has been stated that the gist of fraud in such case is not the breach of the agreement to perform, but the fraudulent intent.'"

6

*Sea-Land*, 224 Va. at 351, 297 S.E.2d at 651 (quoting *Lloyd v. Smith*, 150 Va. 132, 145, 142 S.E. 363, 365 (1928); citing Restatement (Second) of Torts § 530 comment c (1977)); *id.* at 351-352, 297 S.E.2d at 652 ("when Nappi told O'Neal she 'could have the [teletype operator/messenger] job' if she 'turned [in] the letter [of resignation from the sales representative position],' he made this promise with the then present intention not to perform it. Hence, O'Neal proved her allegation of intentional fraud, and it was not error for the trial court to submit the fraud question to the jury.").

     3.     **<u>ADA and PDA Discrimination</u>:**

        a.     **<u>Adverse Act</u>: There is no reason to analyze traditional notions of "constructive discharge" — the law is clear, if the employee was denied the opportunity to make a free choice of resigning due to misrepresentation or deception, it is a "constructive discharge."**

As this Court has stated previously,

> Under the "misrepresentation" theory, a resignation may be found involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation. *See Scharf*, 710 F.2d at 1575. A misrepresentation is material if it concerns either the consequences of the resignation, *see id.* (effect on accumulated sick leave) or the alternative to resignation, *see Covington*, 750 F.2d at 942 (omission to explain right to be reassigned if resignation declined). The reliance must be reasonable under the circumstances. *Scharf*, 710 F.2d at 1575.

*Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 174 (4th Cir. 1988); *see also*

*Scharf v. Dep't of Air Force*, 710 F.2d 1572, 1575 (Fed. Cir. 1983) (resignation was

not voluntary as plaintiff was misled as to the consequences of his optional retirement, he reasonably relied on what was relayed to him by the company official, and it was of no consequence whether the company officially intentionally misled the plaintiff); *Covington v. Dep't of Health & Human Servs.*, 750 F.2d 937, 942 (Fed. Cir. 1984) ("resignation or retirement is involuntary if it is obtained by agency misinformation or deception" (citation omitted)… "the misleading information can be negligently or even innocently provided; if the employee materially relies on the misinformation to his detriment, his retirement is considered involuntary"); *Parrinello v. Finn*, 589 F.2d 100, 101 (2d Cir. 1978) (reversing district court's dismissal of claim for reinstatement and back pay because of material misrepresentations leading to his resignation from employment and instructing the district court to make further findings of fact with regard to whether there in fact had been a misrepresentation); *Fagan v. Palm Beach Cty. Sheriff's Office*, No. 19-80403-CIV, 2019 U.S. Dist. LEXIS 147572, at *1-3, 9 (S.D. Fla. Aug. 27, 2019) (holding in an ADA case, "[a]lthough Plaintiff was told he would return to his position as a Parking Enforcement Specialist if he resigned, he was not rehired when he reapplied. Viewing the facts in the light most favorable to Plaintiff, the undersigned cannot conclude that his resignation was voluntary."); *Estate of Allen v. Balt. Cty.*, Civil Action No. CCB-13-3075, 2017 U.S. Dist. LEXIS 208949, at *12-16 (D. Md. Dec. 20, 2017) (holding in an ADA case that signed consent to reassignment was

involuntary when employer misrepresented alternatives to reassignment, "the County by means of misrepresentation and/or coercion led Allen to sign a so-called voluntary reassignment form without the benefit of alternate employment accommodations required by law. Accordingly, Allen suffered an adverse employment action for which the County is responsible").

Here, the consequence of the resignation was misrepresented to Ms. Schack: Ms. Schack was informed that the only consequence of her resignation was that she would be laterally transferred to the HIM Clerk Position (*see* JA 191-195); instead, she was terminated from employment. Notably, Regional Director Gillespie never informed Ms. Schack that she was in jeopardy of losing her employment with Parallon if she submitted the resignation for her current position, an omission that Ms. Schack reasonably relied upon (*see* JA 191-195, 499-500).

Moreover, while intentional conduct on behalf of Regional Director Gillespie is unnecessary, Regional Director Gillespie has clearly lied about what occurred here, indicating that her misrepresentations to Ms. Schack were intentional. Parallon provided a verified interrogatory response stating that Regional Director Gillespie, and the rest of management, were unaware that Ms. Schack even applied for the HIM Clerk position and "had nothing to do with this process":

> qualified. Unbeknownst to Ms. Gillespie, Ms. Caldwell or Ms. Albert, Plaintiff applied for an HIM Clerk position on or about November 10, 2018. Plaintiff failed to report to her shift on November 8, 2018 and then she voluntarily resigned her employment on November 12, 2018, effective November 13, 2018. On November 13, 2018, Erica Strickland, recruiter, contacted Plaintiff by email regarding her application for the HIM Clerk position asking Plaintiff for permission to contact Ms. Albert because Plaintiff had worked in her Registrar position less than six month, and Plaintiff failed to respond. Because Plaintiff never responded to the recruiter, Plaintiff was not considered for the position. Ms. Albert, Ms. Caldwell and Ms. Gillespie had nothing to do with this process.

(JA 629). After Regional Director Gillespie realized that Ms. Schack still had the text messages which clearly refuted these false statements, Regional Director Gillespie tried to backpedal in deposition and displace blame onto Supervisor Caldwell:

> Q.    Have you ever told anyone that you were unaware that Ms. Shack applied for the HIM clerk position?
> A.    I don't think I've ever stated I was unaware.
> Q.    Did you ever speak with the HIM clerk hiring manager and/or recruiter concerning Ms. Shack's application?
> A.    No. When Ms. Shack notified me that she had gotten an e-mail from the recruiter, **I reached out to Suzanne [Caldwell]**, because Suzanne would have a relationship with the hiring director, the HIND is what we call them, and I asked her to get in touch and make sure that she was aware that Ms. Shack had put in an application.

(JA 364) (Emphasis added). But, as Supervisor Caldwell testified, this simply was not true:

> Q.    Were you ever informed Ms. Shack was interested in any other position within Parallon?
> A.    Not to my recollection.

(JA 468).

10

The dishonesty did not stop there. Regional Director Gillespie claimed at deposition that she did not have any idea why Ms. Schack submitted a resignation:

> Q.     Out of the blue Ms. Shack e-mailed you to say, hey, I sent this resignation letter? That's your first memory of Ms. Shack discussing potentially sending a resignation letter with respect to her patient access form position?
> A.     Other than I knew that she was looking for other employment opportunities, I did not have an indication that she had intended to resign.
> Q.     So then when you did learn that perhaps she had an intent to resign from her patient access department position? Did you ask her why?
> A.     No.

(JA 372; JA 402, "the resignation did kind of surprise me"). Yet, the text messages related to this issue tell a very different story:



(JA 498). The use of the word "the" before "resignation email" visibly indicates that Regional Director Gillespie was aware that the resignation email was forthcoming. Moreover, Regional Director Gillespie responded to Ms. Schack's text indicating that she would let the hiring manager for the HIM Clerk position, Debbie, know,

11

which entirely comports with what Ms. Schack has indicated: that she was informed by Regional Director Gillespie that she [Ms. Schack] was required to submit the resignation email in order to effectuate the transfer (JA 194).

In short, the law is clear, if the employee was denied the opportunity to make a free choice of resigning due to misrepresentation or deception, intentional or otherwise, it is a "constructive discharge," without resort to traditional notions of constructive discharge. Here, not only is this met, while unnecessary, Regional Director Gillespie went one step further: her misrepresentations were intentional.

**b.    "Qualified":**

> "'[Q]ualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position . . . and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

*Merrill v. McCarthy*, 184 F. Supp. 3d 221, 236 (E.D.N.C. 2016). Appellee's misunderstanding of what "qualified" means is no defense to the admission that it made that "Parallon believed [Ms. Schack] could perform her duties" (JA 695). Parallon's argument is that Ms. Schack, despite her disability, could perform her job duties, but, according to Parallon, she just simply was not. This is a defense it could have raised in response to the third prong of the test, whether the employer discharged her because of her disability, if Ms. Schack had been terminated. However, Ms. Schack was not terminated, and, moreover, Parallon does not argue

that her alleged non-disability related flouting of the attendance policy, ***which did not occur in any event***, was the catalyst for her constructive discharge, and thus, their argument is irrelevant to the issues at hand. Again, "qualified" means, focusing on the individual's disability, whether they can perform the essential functions of their job with or without an accommodation. It does not address whether they are adequately performing those job duties unrelated to their disability.

### i. Appellant argued before the district court that she was qualified.

Appellant is not amending her complaint and has clearly always alleged she was qualified (JA 14, 16-17). Moreover, Appellant argued before the district court that she was qualified as she could perform the essential functions of an open available position for Parallon with or without accommodation. Despite Parallon's representation to the contrary, counsel for Appellant addressed the matter at length at oral argument (JA 729-731) and addressed it on brief (District Court Dkt. No. 46, Pageid#: 526, "Recruiter Strickland admitted that Ms. Schack was qualified for the HIM Clerk position or Recruiter Strickland would not have sent the email to Ms. Schack concerning permission to speak to Ms. Schack's supervisor about the transfer (Ex. 37, at 18)"; District Court Dkt. No. 46, Page id#: 523 ("And, Parallon certainly cannot hold Ms. Schack's need for accommodation against her to say she was not adequately performing. *E.g.*, *Barnett v. Revere Smelting & Ref. Corp.*, 67 F. Supp. 2d 378, 392 (S.D.N.Y. 1999) ("where an employer asserts excessive

13

absenteeism as a non-discriminatory justification for an employee's termination, that

justification cannot analytically be considered apart from the alleged disability

causing the absenteeism") (citing *Teahan v. Metro-North Commuter R.R. Co.*, 951

F.2d 511, 516 (2d Cir. 1991) (denying summary judgment on Rehabilitation Act

claim on ground that question of fact existed as to whether employee's absenteeism

was caused by his handicap)).").

> ii.  **Ms. Schack did not miss too much work such that she was not a "qualified" individual.  She was not even terminated, let alone terminated for missing work.**

Ms. Schack previously addressed in her Opening Brief that she did not miss

the amount of work that the district court held[1] she did, and, again, she was

terminated *in less than 3 months* after her pregnancy-related disability began, *while

still engaging in the interactive process with Parallon*.

Moreover, with regard to Parallon's repetitive reference to Ms. Schack

"violating policy" by texting to notify Parallon that she would be absent, Parallon

entirely ignores that Regional Director Gillespie informed Ms. Schack that she was

permitted to text in regard to any absences (JA 182-183, "[Director Gillespie] told

me that she was sorry about all of this, that a text message was appropriate due to

---

[1] Despite Parallon's repeated reference to the hand-written note, a hand-written note is not determinative of how many days Ms. Schack missed nor is it more reliable than the evidence relied upon by Appellant: Parallon's electronic schedule and time records.

my illness, and the way that the illness impacted my everyday life as well as speaking on the phone").[2]

Continuing, as Appellee stated in her Opening Brief, the district court, in error, (1) considered only whether Ms. Schack could perform "her job as a registrar" (JA 757), despite the fact that Ms. Schack was also offered the HIM Clerk position by Regional Director Gillespie, (2) failed to consider whether Ms. Schack could have performed her position or an open position with a reasonable accommodation, such as shorter shifts, and (3) applied a case that applies in situations in which the plaintiff was terminated for absenteeism, which is not the case here.

To expound on this last point further, Appellant agrees that absenteeism due to a disability *may* render an individual not "qualified" *if* they cannot perform the essential functions of their current position or an open, available position with or without reasonable accommodation. However, that is simply not the case here. Tellingly, in the cases relied upon by Parallon, (1) the plaintiff was actually fired, (2) after it became unreasonable to accommodate them in some other way, such as

---

[2] Parallon has also tried to distort the record as to Ms. Schack's notice to Parallon when she would have to miss work. Parallon stated on brief, "Schack admits not showing up for her shift on October 26, 2018 (JA 173-174). She found a replacement but she did not tell anyone about it. *Id.*" What Parallon omitted was that Ms. Schack actually testified, "Correct; *my colleague spoke with her*" (JA 173) [Emphasis added].

time off work, and (3) there was no other accommodation, such as transfer to another position or shorter shifts, that could permit their attendance to improve.

Here, Plaintiff could, with or without reasonable accommodation, perform the essential functions of the HIM Clerk position. The testimony was that Ms. Schack was qualified for the position (JA 661), and the position was likely to improve Ms. Schack's ability to work as it would be easier on Ms. Schack (instead of running around an E.R., she would be seated in an office chair, and the hours would be consistent, not erratic shifts at all hours of the day and night) (JA 582; JA 421; JA 189).  The lack of accommodation in this regard forecloses the finding that, as a matter of law, Ms. Schack could not have performed the essential functions of the HIM Clerk position.  *Torres v. Hilton Int'l of P.R., Inc.*, 2012 U.S. Dist. LEXIS 91436, at *12-14 (D.P.R. July 2, 2012) (finding that because the plaintiff, who was bipolar, was not accommodated, the record lacked evidence that the plaintiff's attendance issues would have continued had she received reasonable accommodation); *Pettus v. Am. Safety Razor Co.*, 2001 U.S. Dist. LEXIS 6968, at *12 (W.D. Va. Mar. 29, 2001) ("Although the defendant alleges that the plaintiff is not a 'qualified individual' under the ADA because her performance did not meet the defendant's legitimate expectations, the defendant never has alleged that absenteeism or resulting subpar performance played a role in the plaintiff's discharge."); *EEOC v. Browning-Ferris, Inc.*, 262 F. Supp. 2d 577, 586 (D. Md.

2002) ("Furthermore, if Ms. Brown was not meeting BFI's expectations, either because of excessive absenteeism or some other reason, it presumably would not have attempted to find another position for her at BFI as it contends it did. In sum, there are genuine questions of material fact precluding summary judgment on the question of whether Ms. Brown was meeting BFI's legitimate expectations when fired."); *Jacobson v. Barnhart*, No. WMN-05-1381, 2006 U.S. Dist. LEXIS 104525, at *12-13 (D. Md. Dec. 14, 2006) ("Finally, Defendant's argument that Plaintiff 'was not a 'qualified individual with a disability' because she could not come to work on a regular basis," Def.'s Mot. 15 (emphasis added), conflates the issue of whether Plaintiff is a qualified individual with a disability with the issue of whether allowing Plaintiff to work part-time from home is a reasonable accommodation. A person can be qualified individual with a disability if they are able to do their job with reasonable accommodation. It is undisputed that Plaintiff would have been able to work a significantly greater percentage of time in 2003 had Defendant granted the accommodations she requested.").[3]

---

[3] In addition, despite Parallon's representations, Ms. Schack did complete her online training (JA 179-180, "Right, and I completed those.").

### iii. Parallon's statements on brief related to Ms. Schack's alleged refusal to move to a PRN status are not supported by the record.

Parallon argues that Ms. Schack was not qualified because she failed to accept a PRN (as-needed) status (Appellee Brief at 36). Parallon cites no authority to support this legal argument, and the factual basis of the argument is false. Parallon wrote, "Significantly, in attempting to accommodate Plaintiff, Gillespie offered to try and move Plaintiff into another position in the Patient Access Department managed by Gillespie which was a PRN position and did not require Plaintiff to work a set number of hours each week (JA 182, 295-296, 351, 362-363, 374). Plaintiff declined. *Id.*" (Appellee Brief at 36). Reviewing JA 182, 295-296, 351, 362-363, 374, there is no evidence that Ms. Schack declined a PRN position / status offer. In fact, Parallon never asked Ms. Schack about the alleged PRN position / status at deposition.

### 4. ADA and PDA Failure to Accommodate:

### i. Parallon's statements on brief related to Ms. Schack's alleged refusal to move to a PRN status are not supported by the record. Moreover, what the record does establish is that even if a PRN position / status was offered, it would have been inferior to the HIM Clerk position, which was clearly offered as an accommodation.

Parallon again argues that Ms. Schack declined a PRN position / status (Appellee Brief at 39-40), this time for the legal argument that Ms. Schack turning down the PRN position / status means that Parallon did not have to follow through with their offer to accommodate Ms. Schack in the HIM Clerk position (*Id.*). Again,

18

there is no factual support for Parallon's statement that Ms. Schack turned down an offer for a PRN position / status. Moreover, as Regional Director Gillespie testified, the position / status would not have been lateral or equivalent like the HIM Clerk position, "But knowing that she was pregnant, I specifically told her that the PRN position is not benefited. So, meaning if she had any kind of benefits through Parallon, those would go away if she took a PRN position. So, I wanted to make sure she was aware of that" (JA 362). Therefore, it has no bearing on whether Parallon was required to follow through with its offer to accommodate Ms. Schack in the HIM Clerk position.

> ### ii. Failure to offer a transfer to an open, available position for which Ms. Schack was qualified is an adequate basis to allege a failure to accommodate claim.

Failure to offer a transfer to an open, available position for which Ms. Schack was qualified is an adequate basis to allege a failure to accommodate claim. *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 324 (4th Cir. 2011) (finding that a reasonable jury could conclude that plaintiff was constructively discharged when a transfer was not offered and noting that the plaintiff's disability could have been accommodated by "transferring her to another school, especially a middle school, where she could have had a reduced caseload with different responsibilities").

And, with regard to not actually receiving the HIM Clerk position, Parallon keeps trying to blame Ms. Schack for not responding to Ms. Strickland. Yet, Ms. Schack was told by Regional Director Gillespie to "not to do anything, that she [Regional Director Gillespie] would reach out to them" (JA 203), which is confirmed by the text messages herein:



(JA 499-500). Parallon cannot, therefore, now blame Ms. Schack that Regional Director Gillespie lied to Ms. Schack and did not actually reach out, despite Regional Director Gillespie's representations to the contrary that she would.

### iii.   Before the transfer was offered, Parallon failed to accommodate Ms. Schack with shorter shifts.  Moreover, Ms. Schack made the request for shorter shifts again on November 7, 2018.  There was no request for medical records to support this second request before Ms. Schack was constructively discharged.

Regarding shorter shifts, Parallon tries to confuse the record by analyzing the time period before Ms. Schack notified Parallon that she was pregnant (which was the time period Ms. Schack was training) and immediately thereafter.  As is clear, the relevant timeframe is after Ms. Schack requested the accommodation. Again, comparing the month before Ms. Schack made an accommodation request to the month after she made the accommodation request, Ms. Schack's shift length *increased*, she no longer had any short shifts (such as 4-5 hour shifts) as she did the month prior, and her shift ending time was moved later (the latest shift in the month before her accommodation request was 7:30 p.m., the latest shift in the month after her accommodation request was 12:30 a.m.) (JA 278; JA 279).

With regard to a doctor's note for the request, Appellee agrees that a doctor's note was not submitted for this request.  However, Regional Director Gillespie stated that the request was not going to be granted, period:

| | |
|---|---|
| **From:** | Gillespie Jenny |
| **Sent:** | Monday, October 15, 2018 11:33 AM |
| **To:** | Spencer-Bennett Harriett |
| **Cc:** | Caldwell Suzanne |
| **Subject:** | Clara Schack |
| | |
| **Importance:** | High |

Good Morning, Harriett,

Clara Schack reached out to Suzanne this am to ask for additional accommodation (not to be scheduled more than 5-6 hours per shift); we sent her in your direction. We cannot support any additional accommodations at this point and Clara will be scheduled as needed.

Please advise if you need to talk – Thanks.

**Jenn Gillespie**
**Regional Director, Patient Access**
**Parallon Business Performance Group**
C: 540.315.0317
P: 540.776.4745
Jennifer.Gillespie@parallon.com
www.parallon.com

**PARALLON**

(JA 269).  Moreover, the request did originate from Ms. Schack's physician (JA 260, lines 5-9), which HR Spencer-Bennett informed the rest of management of on October 30, 2018 (JA 297, "Her physician has recommended that she is able to work at least a 5-6 hour shift.").

Additionally, on November 7, 2018, just before Ms. Schack was constructively discharged, Ms. Schack again informed Regional Director Gillespie, that she "needed shorter work hours because I never knew when I was going to be sick," to which Regional Director Gillespie responded, not asking for a medical note, but instead, "that she would get with Lisa [Albert] and Suzanne [Caldwell] and she would excuse my absences as well as create a plan, and she actually told me – she asked me if I needed some more time off, and she told me that she would let Lisa and Suzanne know I would not be there for my next shift" (JA 182-183).  Regional

Director Gillespie assured Ms. Schack that she need not do anything further with respect to her accommodation requests or missed days (JA 190, Regional Director Gillespie "just said that it would all be taken care of per her," that Regional Director Gillespie would be the one handling it from there (JA 185)). *See, e.g.*, *EEOC v. Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d 89, 106 (D. Md. 2019) ("Therefore, M&T Bank cannot now contest the adequacy of McCollin's notice, on the ground that she failed to produce medical records that M&T never requested.").

In conclusion, Ms. Schack was not accommodated with shorter shifts after her initial request, as of October 30, 2018, HR Spencer-Bennett acknowledged that the request was from Ms. Schack's physician, even though there was not a formal note from the doctor in the file, and Ms. Schack, after having not been accommodated as requested, requested the accommodation again on November 7, 2018, and, this time, no medical documentation was requested. Instead, Regional Director Gillespie stated the accommodation process would be taken care of per her. Regional Director Gillespie then constructively discharged Ms. Schack on November 12, 2018.

## CONCLUSION

For the foregoing reasons, and the reasons stated in Ms. Schack's Opening Brief, Ms. Schack requests that this Court reverse the judgment of the district court and remand the case for further proceedings.

Respectfully Submitted,

/s/ Brittany M. Haddox
Brittany M. Haddox
Thomas E. Strelka
STRELKA EMPLOYMENT LAW
119 Norfolk Avenue, SW, Suite 330
Roanoke, Virginia 24011
(540) 283-0802

*Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with type-volume limits because, excluding the parts of
the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure
statement, table of contents, table of citations, statement regarding oral
argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*5,484*] words.

[   ] this brief uses a monospaced type and contains [*state the number of*]
lines of text.

2.     This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using
[*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[   ] this brief has been prepared in a monospaced typeface using [*state
name and version of word processing program*] with [*state number of
characters per inch and name of type style*].

Dated: <u>August 17, 2021</u>       <u>/s/ Brittany M. Haddox</u>
                                           *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 17th day of August, 2021, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Brittany M. Haddox
*Counsel for Appellant*